STATE of Missouri at the Relation of STATE HIGHWAY COMMISSION of Missouri, Plaintiff-Respondent,

v.

Joseph A. BRUENING, Della M. Bruening, and Roy K. Dietrich, Teresa M. Hauber and Joseph A. Bruening, Trustees, Defendants-Appellants.

No. 46708.

Supreme Court of Missouri,

Division No. 1.

July 13, 1959.

Edgar Shook, E. Frederick Beihl, Sebree, Shook, Hardy & Ottman, Kansas City, Alan F. Wherritt, Liberty, Ilus W. Davis, John H. Windsor, Jr., Dietrich, Tyler, Davis, Burrell & Dicus, Kansas City, for appellants.

Robert L. Hyder, Minor C. Livesay, Jefferson City, for respondent.

HOUSER, Commissioner.

This is a suit by the State of Missouri at the relation of the state highway commission to condemn part of an undeveloped tract of land in Clay County, for highway purposes. A trial in circuit court upon the landowners' exceptions to the commissioners' report resulted in a judgment assessing damages to the landowners at $31,-365. From that judgment the landowners have appealed.

Three points, all related to the refusal of evidence offered by the landowners, are raised on this appeal.

Defendants owned two quarter sections, one immediately north of the other. Previous to the institution of the condemnation proceedings, in July, 1954, they sold an irregularly shaped, 40-acre tract off the northeast corner for school purposes, thus leaving 280 acres, all of which, by stipulation of the parties, are to be considered and treated as an entirety or unit and as constituting one tract or body of land, in determining damages and benefits. The terrain of the two quarter sections is general-

ly irregular. It is rolling to rough in character, with some ravines. The northeast corner (the school site) is rolling. The southwest portion is rocky or high, a high bank of ground, hilly. The southeast corner is rolling. Rock Creek bisects the property, entering the northwest corner, flowing · diagonally in a southeasterly course, and leaves the property just north of the southeast corner. Rock Creek flows through a low area, a valley which, according to a contour model based upon topographic survey maps, is from 70 to 100 feet lower than the higher elevations on some of the surrounding land.

In order to determine the adaptability of the land for development the landowners, prior to the filing of condemnation proceedings, had caused land surveys, studies and drawings to be made. Sketches of the ground were made for many uses, one for the proposed use of the land for residential lots of land of generous size, on which homes costing $20,000 to $25,000 were to be built, one where apartments might be incorporated, and one involving a shopping center.

The highway commission condemned a total area of about 41 acres of the 280-acre tract. The land condemned is roughly in shape of a Y. The left branch or prong of the Y (U. S. Highway 71) curves to the west, leaving the tract on its western boundary between the east-west center line and the northwest corner, while the right branch or prong of the Y (U. S. Highway 69) curves to the right and leaves the tract on its eastern boundary just south of the east-west center line. The branches or prongs of the Y unite immediately north of the center of the southern boundary of the tract. The taking of the 41 acres divided the 280-acre tract into three parts, a northern portion, a southeastern portion and a southwestern portion. Russell Road forms the southern boundary. South of the tract a ramp system was built by the highway commission, connecting U. S. Highways 69 and 71 with Russell Road. The construction of the highways, underpasses, had been completed at the time of trial.

Landowners' expert witnesses testified that by the taking the market value of the 280-acre tract had been diminished by various amounts ranging from $123,625 to $160,000. The highway commission's expert witnesses testified that its market value had been increased from $32,500 to $144,000.

Before July, 1954, there was access to the 280 acres around its perimeter but no roads had been developed providing access to the interior of the tract. The highways built under the present condemnation proceedings are limited-access highways, i. e., they cannot be entered from all points along them, but only from certain points. No access was provided from the interior of the 280-acre tract to the U. S. Highway 69 prong of the Y. Access from the interior of the 280-acre tract to the U. S. Highway 71 prong of the Y was provided at one point only, namely, at a point near the east-west center line of the 280-acre tract. There the highway commission built two ramps parallel to the highway, one on the east and one on the west, the ramps descending from highway grade level to a paved underpass, which crosses the highway at right angles, below the highway This is referred to as the Davidson Road underpass. It integrated with a platted and planned, but not actually constructed, street known as Davidson Road, according to the subdivision plans. Davidson Road underpass was graded and paved from the west to the east boundaries of the highway right of way. Its west end was approximately on grade with the surrounding terrain. The east end of the underpass, however, abruptly ended in a sharp drop-off of 22 to 25 feet in depth, down to the low area through which Rock Creek flows. It is impossible to go beyond the east end of the underpass, either by vehicular traffic,

or by walking. This is a view of the east end of the underpass, taken from the east looking west, showing the condition in which the property was left when the highway commission completed the grading and construction of the underpass.

The landowners introduced evidence, and it was generally admitted, that it would be necessary to construct an earthen ramp or fill, with concrete drainage culverts, immediately east of the Davidson Road underpass, extending some distance across the low Rock Creek valley to a comparable elevation on the northeast portion of the 280-acre tract, in order to provide the necessary grade for traffic to travel back and forth from that area of their land to the Davidson Road underpass and thence onto U. S. Highway 71. Witness Duncan testified: "The only way you could go from one point to the other would be by an earth fill heavily compacted or by means of a bridge." Witness Byers expressed it this way: "Your underpasses have to be tied into streets, and to utilize that it would take a ramp or a very substantial amount of fill in there; you would have to have something across the drain there, a bridge or something."

While there was general agreement as to the necessity of a fill, ramp or bridge to connect the underpass with the eastern terrain the experts were in conflict on the question whether this situation of necessity, this abrupt drop-off, resulted artificially from the manner in which the highway was constructed or naturally from the previously existing lay of the land. Landowners' witness Duncan testified that the underpass on the east is built upon a 22-foot fill, and not on grade with the natural terrain; that the highway commission filled dirt in "clear to the edge of their

highway," to make it steeper. Their witness Byers testified that the east end of the underpass is 15 to 20 feet above grade, but on cross-examination Byers conceded that "That is the way the land was, that is the way the good Lord made it." Their witness Sapp, on cross-examination, testified that the east end of the underpass was constructed out to the landowners' property line "at approximately the grade level of the existing ground"; that instead of it being constructed upon a fill the underpass was built upon ground "partly filled and partly cut."

Appellant-landowners' first point is that the court erred in refusing to receive evidence, and in refusing their offer of proof, relating to the cost of constructing and grading an earthen ramp or fill, with concrete drainage culverts, from their land east of U. S. Highway 71 to the Davidson Road underpass and ramp, because this related to a proper element of damages to appellants' land remaining after the taking; that there was evidence that the highway was so constructed as to obstruct and interfere with appellants' right of access to the highway and to their land west of the highway, thereby compelling appellants to incur additional expenses in overcoming the obstruction and interference in order to make use of their remaining land for the purposes to which it was adaptable and capable of being put. Landowners point out that before the taking, i. e., before the natural terrain was altered, there was no necessity for them to build any structures in order to cross from one side of the land to the other; that they could "pick any point they wanted to cross their land"; but now because of the taking and the manner of construction of the underpass, defendants are compelled to expend substantial sums of money in order to use the land for residential purposes and to cross from one side of the land to the other. Twice defendants offered evidence that the cost of fills, grading and culverts would be $22,672, and twice the court sustained objections thereto. In support of the action

of the court the highway commission takes the position that the expenditures in question were not made necessary by the construction of the highway; that the land slopes abruptly from the west across U. S. Highway 71 to Rock Creek, and then rises abruptly to the east of Rock Creek, that at the point in question the natural slope of the land was dropping very abruptly to the creek bed of a stream bordering the right of way; that Davidson Road underpass was built approximately at grade level of the ground as it existed before the construction of the underpass; that the condition now existing was a condition existing before the condemnation of the land, and that the necessity for the making of a fill to connect the east end of the underpass with defendants' land east and north of the underpass and across the creek bed was not the result of the construction of the highway but was due to the natural slope of the land.

■■■ Was evidence of the cost of the fill, grading and culverts admissible on the question of the landowners' right to compensation for consequential damages to the portion of the land not taken by the condemnation? "In estimating the amount of consequential damages sustained, or, in other words, the amount of the depreciation in the value of the land, the owner is entitled to have the jury informed as to all those facts relating to the condition of the property which would naturally impress a person of ordinary prudence in negotiating for the purchase of the same. The use to which the property has been devoted, and its capability or special adaptation for such use, are of course primary elements to be taken into account; and anything which is directly injurious to such capability or special adaptation for a particular use, and thereby affects the market value of the property, is therefore competent to be shown as a legitimate factor in bringing about the total damage sustained for which it is contemplated that the owner shall receive just compensation." City of St. Louis v. Paramount Shoe Mfg. Co., 237

Mo.App. 200, 168 S.W.2d 149, loc. cit. 153. Generally speaking, in determining the diminution of the market value of the land not taken, it is proper to take into consideration the expense necessarily incurred by reason of the improvement, 29 C.J.S. Eminent Domain § 164, in order to restore the remaining land to a condition that will make it available for the most advantageous use, 18 Am.Jur., Eminent Domain, § 269; 4 Nichols on Eminent Domain, 3rd Ed., § 14.247, or of "adjusting the property to the changed conditions, brought about by the taking, * * *." 2 Lewis, Eminent Domain, 3rd Ed., § 753 (503f); Chicago, S. F. & C. Ry. Co. v. McGrew, 104 Mo. 282, 15 S.W. 931. Accordingly, consideration has been given to the costs and expenses incurred in constructing an entranceway into the landowners' property, "to make the remaining property available for use," State ex rel. State Highway Commission of Missouri v. Pope, 228 Mo.App. 888, 74 S.W.2d 265, loc. cit. 270; in reconstructing a bridge, Kansas City v. Kansas City Belt Ry. Co., 102 Mo. 633, 14 S.W. 808, 10 A.L.R. 851 [1]; in constructing a bridge made necessary for the purpose of using the property for a previously available use. East Side Levee & Sanitary Dist. v. Mobile & O. R. Co., 279 Ill. 319, 116 N.E. 727; East Side Levee & Sanitary Dist. v. East St. Louis, C. & W. R. Co., 279 Ill. 362, 116 N.E. 726; Louisiana Highway Commission v. Treadaway, La.App., 173 So. 209, affirmed, La.App., 175 So. 94; Louisiana Highway Commission v. Bradberry, La.App., 193 So. 198; Myers v. Wilmington-Wrightsville Beach Causeway Co., 204 N.C. 260, 167 S.E. 858.

■ Under these rules the evidence was admissible. The necessity for the construction of a ramp, with culverts, in order to utilize the Davidson Road underpass to and from the northern portion of the tract was conceded. Two of landowners' witnesses testified that the east end of the underpass is built upon a fill, variously estimated at from 15 to 22 feet, and not upon the pre-existing grade of the natural terrain. From the evidence the jury, properly instructed, could have found that the highway construction changed and altered the previously existing condition of things, i. e., that as a result of the taking and of the construction of the improvement the landowners are now confronted with a new situation, a new problem involving cost and expense to them in the utilization of the property for a previously available use, a predicament which did not exist prior to the taking, and that the change and alteration, with its attendant additional expense, was such as to adversely affect the market value of the land not taken by condemnation.

■ The highway commission takes exception to the form of the offer of proof on the ground that "there was no showing that such expenditures were made necessary by and the result of the construction by respondent of U. S. Route 71." The offer was to prove "by the witness Harold Sapp that to provide a feasible means of access from the east of the underpass * * across Rock Creek * * * to the land * * * east of the highway * * * by a feasible means of access, it would require a total of 21,840 cubic yards of earth * * ; that the total cost * * * would amount to the sum of $22,672.00, which in the opinion of the witness would provide a safe and economical way of passage from the end of the concrete stub, etc. * * *." The offer of proof was "not made as a separate or cumulative item of damages, but for the consideration of the jury in their determination of the damages caused by the

1. "Here the city seeks to widen the street, and in doing this not only appropriates part of the defendant's right of way, but throws upon the company the expense of removing banks of earth, and readjusting the bridge to conform to the new order of things. These expenses thus brought about, on the plainest principles of justice, constitute elements of damages to be allowed the company in the proceedings to condemn property * * *." Id., 14 S.W. loc. cit. 810.

appropriation of the property in question, to the remainder." The offer showed what evidence would be given if the witness were permitted to answer, and the purpose and object of the testimony to be introduced. The court was possessed of all of the facts necessary to establish its admissibility, within the requirements of City of St. Louis v. Pope, Mo.Sup., 121 S.W.2d 861, loc. cit. 863. It was not necessary that the offer of proof incorporate every fact upon the basis of which the evidence was offered. It is sufficient that the offer of proof be "an appropriate link in the chain of proof." McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 766, 80 L.Ed. 1205. The offer itself did not need to recite that the expenditure was made necessary by the construction of the highway, because that had been sufficiently demonstrated by the testimony of witnesses Duncan and Byers.

■ The highway commission further complains that the offer of proof was fatally defective because it lacked a statement that the expenditure of $22,672 for culverts, fill and grading would reduce or mitigate the damages sustained by landowners; that such costs can be shown only when they are less than the depreciation of the market value of the property before and after the taking, and that there was no showing that these costs were less than the depreciation; that the admission of the evidence of cost was an attempt to increase the damages, recover additional damages over and above those sustained by the appropriation, and that special items of damages can be shown only as a part of the total damages and not as a separate, distinct item where the entire case has been based upon the market value of the property before and after the taking. The commission counts upon the rule that where the cost of restoration of the property exceeds the difference in market value before and after the taking, the recovery is limited to the depreciation in the market value of the property, citing State ex rel. State Highway Commission v. Southern Securities Co., Mo.App., 60 S.W.

2d 632; State ex rel. State Highway Commission of Missouri v. Baumhoff, 230 Mo. App. 1030, 93 S.W.2d 104. That rule is not applicable to the instant situation since the evidence did not show that the cost of the culverts, fill and grading ($22,672) plus the cost of fencing ($14,607) would exceed the difference in the market value before and after (variously estimated by landowners' witnesses at $123,625 to $160,-000). To the contrary, it is plain in this case, according to landowners' witnesses, that restoration cost would be much less than depreciation in market value. There was no danger of double recovery. The offer of proof specifically renounced any intention to count upon this item of cost as a separate and cumulative item of damage, and restricted the jury's consideration of this item as a part of the over-all assessment of damages. A proper instruction so as to avoid any question of double damages, such as Instruction No. 3 given for plaintiff in Smith v. Kansas City, 128 Mo. 23, 30 S.W. 314, could have been given, and on retrial should be given.

■■ Appellant-landowners' second point is that the trial court erred in refusing their evidence of the cost of fencing their remaining land along the highway right of way. Landowners' expert testified that from his experience in constructing fencing along limited-access highways, link chain fencing would be desirable on the land along the highway. The highway commission's counsel objected to testimony as to the cost of fencing on the ground that there was no showing that fencing was required; that fencing costs here would be voluntary expenditures by the landowners, and that the evidence would not tend to prove or disprove any of the issues. The objection was sustained, whereupon landowners offered to prove that the cost of installing link chain fencing along the 10,820 feet of frontage of the highway would be $1.35 per foot, and that the installation of such link chain fence was "desirable and necessary along this highway." The offer was refused. Landowners argue that be-

fore the taking the land was not criss-crossed by speedways; that in the development of the area as a residential district, entered by ordinary streets, fencing would not be necessary, but that after the location of the highways, "when speedways slice through the area," fencing is desirable and needed in the proper development of the land for residential purposes, to safeguard children and others living in the area; that the cost of fencing would be an item for an ordinarily prudent person to take into account in reaching his conclusion as to the market value of the property for residential development. The offer of proof should have been received and the evidence admitted for the consideration of the jury on the question of the necessity for fencing and the cost of fencing, and submitted to the jury under appropriate instructions. The cases of Southern Securities and Baumhoff, supra, cited by the highway commission, are no more applicable to this item of cost than to the previously considered item of the cost of restoration. The case of Howell v. Jackson County, 262 Mo. 403, 171 S.W. 342, cited by the highway commission, does not sustain the action of the court. In Howell an erroneous instruction was given which permitted the jury to consider not only the quantity and value of the land taken but also the cost of building necessary fencing and the damage to the whole tract by reason of the building of the road, thus allowing the jury to award double damages. The court therein pertinently observed that the cost of necessary fencing is but one of the elements going to the making up of the total damages sustained by the taking of land for highway purposes. The highway commission in the instant case admits that where fencing is necessary because of the making of a public improvement the cost of fencing may be considered by the jury in arriving at the damages, not as an individual, separate and cumulative item of damages, but as it may affect the value of the remaining property. Landowners should have been allowed to introduce evidence of the necessity of building fences under their contemplated

use of the land, and upon a showing of the necessity for fencing should have been permitted to introduce evidence of the cost of fencing, under the limitations expressed. 4 Nichols on Eminent Domain, 3rd Ed., § 14.24321; 29 C.J.S. Eminent Domain § 164, p. 1035; 18 Am.Jur., Eminent Domain, § 268.

Appellant-landowners' third point is that the trial court erred in refusing landowners' evidence as to the price paid by the City of Kansas City for tracts of land in the vicinity of appellants' land, bought by the city to establish a municipal service center. It is not necessary to decide the third point in order to dispose of this appeal (since the judgment must be reversed and the cause remanded because of the errors previously noted in connection with Points I and II) but we should express our views on the third point, since the same point may arise on retrial. In the circuit court there was evidence that in acquiring land for the service center Kansas City adopted the procedure of obtaining an option, then having the property appraised, then appropriating money for its purchase. Condemnation ordinances had not been adopted but "it was implied" that if the agent of the city could not negotiate a sale the city would condemn. The record is not clear whether the city council in its instructions to its agents implied that condemnation would follow failure to secure sales by negotiation or whether the agents communicated the implied threat to the prospective sellers, but in either event we take it that the city had a fixed purpose to institute condemnation proceedings if it could not acquire the land by purchase at a satisfactory price. The highway commission objected to the introduction of the record of the sale prices of the properties acquired by Kansas City in this manner, on the ground that the land was acquired for public use and that the sales involved were not open sales representing the true market value. The objection was sustained. It is elementary that the sale price of property similarly located to that involved in the condemnation proceedings,

made in the neighborhood reasonably near the time of the taking, is admissible to aid the jury in determining the compensation to which the landowner is entitled for the taking of his property. In re Armory Site in Kansas City, Mo.Sup., 282 S.W.2d 464. As an exception to this rule, evidence of sales of other lands to the condemner, plaintiff in the condemnation proceeding, may not be admitted as evidence of the value of the land condemned. City of Springfield v. Schmook, 68 Mo. 394; Metropolitan Street Railway Co. v. Walsh, 197 Mo. 392, 94 S.W. 860; Kansas City & G. R. Co. v. Haake, 331 Mo. 429, 53 S.W.2d 891, 84 A.L.R. 1477; Kansas City v. Thomson, Mo.Sup., 208 S.W.2d 216; 5 Nichols on Eminent Domain, 3rd Ed., § 21.33. It is said that such a mode of inquiry into the market value of the land appropriated is improper and furnishes no accurate standard for estimating the defendant's damages, no fair criterion of value, and is likely to complicate and confuse by the introduction of many collateral issues; that the price paid another by a public agency or a private company invested with the power of eminent domain may force a sale at such price as may be fixed by a tribunal appointed by law; that the condemner might be willing to pay more and the landowner might be willing to take less than the actual market value of the land, in order to avoid the risks, expenses and inconvenience of litigation, so that sales of land to the condemner are not voluntary in the sense of sales of land not subject to condemnation, there being present, perhaps on both sides, an element of coercion, but are likely to be the result of a compromise. Authorities, supra. The principle, however, has not been inflexibly applied in other factual situations. In Kansas City v. Boruff, 295 Mo. 28, 243 S.W. 167, a realty company bought a number of tracts of land in an area in which Kansas City proposed to establish a public park. Some of the tracts were purchased before the ordinance of condemnation was passed and some afterward. Most of the deeds were delivered after the ordinance condemning the lands had been passed. The action of the trial court in admitting evidence of the sales price of these transactions over the objection that the purchases were made after the condemnation ordinance was made public; when the land was no longer on the open market, was sustained. This court said: "The theory of the objection is wrong. The land was upon the open market. The owner had the right to sell, and the purchaser the right to buy. The condemnation may or may not have been perfected. The circumstances were all before the jury, and the jury had the right to consider the price, along with the other circumstances, in determining what value it should fix under the law. * * * The evidence was admissible for what it was worth." 243 S.W. loc. cit. 169-170. The court distinguished that case from Walsh on the ground that the purchaser was the condemner in Walsh, whereas in Boruff the purchaser was another than the condemner, and held that the rule in Walsh had no application. In State ex rel. State Highway Commission v. Rauscher Chevrolet Co., Mo.Sup., 291 S.W.2d 89, 55 A.L.R.2d 773, it appeared that after the petition to condemn had been filed the property in question was sold to Rauscher Chevrolet Company against which, as condemnee, the case proceeded. The trial court admitted evidence of the purchase price paid by Rauscher Chevrolet Company to the former owner of the property. This court sustained the action of the trial court on the ground that the price the condemnee paid for the tract during the pendency of the condemnation suit was some evidence of value and tended to aid the jury to some extent in determining the question of the value of the tract at the time of the appropriation. After reviewing all of the cases to which we have alluded, and others, the court approved the result in Boruff, on the ground that the exclusionary rule arbitrarily applied where the condemner is the purchaser should not be extended to other factual situations; that the admissibility of such evidence "should

depend upon whether it tends to aid the triers of fact in arriving at a conclusion on the issue of value and damages and upon the further consideration of whether the particular proffered evidence raises too many collateral questions for determination by the trial court." 291 S.W.2d loc. cit. 95. The instant case, however, involves no such "other factual situation." In Walsh and in the instant case the purchaser was the condemner (or potential condemner). In Walsh the land purchased was to be used in connection with the same purpose for which the land sought to be appropriated was to be used and the purchaser was the condemner in the same condemnation proceedings. In the instant case the land was to be used for a different purpose. The purchaser was not the condemner in the same proceedings, but a potential condemner in other proceedings. These slight dissimilarities, however, do not constitute a differentiation. All of the reasons given for the decision in Walsh apply with equal force in the instant situation. If a sale is made to a city which has a fixed purpose to institute condemnation proceedings if it cannot acquire the land by purchase at a satisfactory price, the price paid has been held not to be a fair test of market price. Sawyer v. Boston, 144 Mass. 470, 11 N.E. 711. If on retrial the court does not invoke the rule of auxiliary policy referred to in Thomson, and if in fact Kansas City had no fixed purpose to condemn if it could not acquire the properties by negotiation; if it appears that no threats of condemnation were communicated to the prospective sellers and that otherwise the sales were voluntary, the evidence should be admitted. The mere fact that Kansas City was invested with the power of eminent domain would not, in and of itself, show that the sales were compulsory rather than fair transactions in the market. 5 Nichols on Eminent Domain, 3rd Ed., § 21.33, p. 297.

For error in excluding the evidence relating to cost of restoration, the judgment is reversed and the cause is remanded for a new trial.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.