KANSAS CITY POWER & LIGHT COMPANY, Appellant-Condemnor,

v.

Mervyn W. JENKINS, Respondent-Condemnee.

No. WD 32110.

Missouri Court of Appeals, Western District.

Jan. 18, 1983.

As Modified March 1, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 1, 1983.

Application to Transfer Denied April 26, 1983.

Lowell L. Smithson (Argued), Russell W. Baker, Jr., Spencer, Fane, Britt & Browne, Kansas City, S. Preston Williams (Argued), Thomas E. Barzee, Jr., North Kansas City, for appellant-condemnor.

Wilbur L. Pollard (Argued), Wm. Harrison Norton, Norton, Pollard & Norton, North Kansas City, for respondent-condemnee.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

NUGENT, Presiding Judge.

Kansas City Power & Light Company (hereinafter KCP & L) appeals from the judgment based upon a jury verdict in a condemnation proceeding which awarded condemnee Mervyn W. Jenkins $1,127,500 for approximately 550 acres in Platte County taken by KCP & L for an electric generating station project. The Jenkins land was part of a 3,000 acre tract acquired by KCP & L. KCP & L primarily challenges the admission of evidence of the rezoning of the property and the interest of other industries either in locating in the area or in becoming joint owners in the project, on the basis that both the rezoning and the interest resulted from the project itself. In addition, KCP & L asserts error in the exclusion of instructions directing that the jury not consider project influence, the admission of evidence showing that other utilities agreed to share litigation expenses and pay certain percentages of the jury award, and the admission of evidence of the sale of other land said to have been made under threat of condemnation. We affirm the judgment.

The central question which recurs in each of the issues raised by KCP & L is: what evidence can be admitted and considered by the jury to determine fair market value of condemned land without running afoul of the "project influence" doctrine? The doctrine provides that, generally, an increase or decrease in the land's value caused by the project's influence itself cannot be considered by the jury. To answer that question, we must carefully examine the nature of the evidence KCP & L wishes to bring under the "project influence" umbrella.

In March, 1974 KCP & L and St. Joseph Light & Power Company (hereinafter SJL & P) jointly filed an application in Platte County for rezoning of the land to be used in its contemplated project. The tract was rezoned in April, 1974 from "agricultural"

to "planned industrial". On June 23, 1975, KCP & L filed its petition in condemnation in Platte County alleging that it needed to acquire Mr. Jenkins' land for the Iatan steam electric generating station but had been unable to purchase the land. KCP&L asked that three commissioners be appointed to assess just compensation. On August 25 the three commissioners assessed the value of the land to be $405,800. KCP & L paid the award and the date of the taking was August 29, 1975. The day before the taking Mr. Jenkins filed his exceptions to the commissioners' report and requested that the court try the issue of damages. On September 2 KCP & L filed its exceptions to the report and requested a jury trial. A change of venue to Clay County was granted, and, after an extensive period of discovery, trial began on June 23, 1980.

The question of the influence of the Iatan project on the value of the property impelled KCP & L to file two motions in limine: First, a motion to quash Mr. Jenkins' subpoenas duces tecum to four witnesses, all employees of KCP & L. Second, a motion prohibiting any reference by Mr. Jenkins' counsel to matters that "do not relate to the landowner's damages as measured by the fair market value of the property immediately prior to the taking of the property on August 29, 1975". That included KCP & L's need for taking the land, its selection of the Iatan site, and the absence of SJL & P, or any other person as a party to this lawsuit. The trial court overruled the motion to quash the subpoenas duces tecum, and sustained that part of KCP & L's second motion relating to KCP & L's need for taking the land, but refused to rule on the other aspects of the second motion, preferring to wait until they arose.

Mr. Jenkins' first witness was Patrick H. Tansey, Jr., director of area development for KCP & L. He acknowledged that the land had assets useful to industry such as a railroad, highway, close proximity to the river for barge traffic and nearby towns for labor supply. Mr. Tansey maintained, nevertheless, that the only reason industries would want to locate plants at the site was the presence of the power plant, that before the arrival of the generating facility no industrial market existed for the area.

John K. Kintigh, a partner in Black & Veatch Consulting Engineers, the firm employed by KCP & L to verify the suitability of the Iatan site for a generating plant, testified that he had advised SJL & P along with KCP & L that the Iatan site was suitable for the project because of such factors as its proximity to water, fuel, transportation and the underlying bed rock suitable for large structures.

At trial KCP & L objected to evidence of the effect of the rezoning of defendant's property from "agricultural" to "planned industrial". A hearing on the objection was held outside the jury's presence. Evidence at the hearing showed that in March and April, 1974, as a preliminary step to establishment of the generating plant in Platte County, KCP & L and SJL & P jointly sought and obtained the zoning change. At first, the trial court sustained the objections to evidence of the "industrial" zoning on the ground that the joint effort of the power companies to obtain the zoning change was "a part of a general overall series of events which culminated in the building of the Iatan Power Plant." The trial proceeded, but on the following day the court reversed that ruling and permitted the condemnee to inquire regarding the effect on the property's value occasioned by its new "planned industrial" zoning classification obtained by plaintiff's efforts. (Throughout the trial, KCP & L continued to object to evidence regarding zoning and the influence of the power plant project on the value of the land and repeatedly and promptly moved a mistrial.)

Mr. Jenkins' expert witnesses, Kenneth Newell and Tom Thomas, testified that the highest and best use of defendant's farm land just before the taking was industrial and that it then had a fair market value of $2,000 to $2,050 per acre. Among the factors leading to these evaluations were the property's size and location in relation to population centers, the availability of transportation, the alluvial deposits that make, a

water reservoir, the drainage, proximity to the Missouri River, and environmental considerations. One expert totaled the value at $1,127,500, precisely the value found by the jury. Mr. Newell and Mr. Thomas also testified that in making their respective appraisals they relied upon comparable sales and, after the court reversed its earlier ruling, upon the "industrial" zoning applicable to the property, but Mr. Thomas testified that in his opinion the highest and best use of the land would be industrial even if the zoning had remained "agricultural". One of the comparable sales they relied upon was a sale of Clay County land by Woodrow Wren to the City of Kansas City. KCP & L objected to evidence of the latter sale as inadmissible because made under threat of condemnation. The court overruled the objection.

Curtis Bliss and Charles Schmelzer, real estate appraisers for KCP & L, testified that the Jenkins property's highest and best use at the time of the taking and for the foreseeable future was agricultural. Excluding the 3,000 acres for the Iatan project, all of the surrounding land, "with rare exception", was used for agricultural purposes. They valued the property at $700 to $705 per acre on the date of taking. Mr. Schmelzer "considered it most doubtful if a typical buyer or typical market in the area would place any value on the property at all having to do with potential industrial use, other than" the "special use" as a steam generating plant planned for the land by the plaintiff. He further noted that sales of nearby properties had all been for agricultural purposes.

Mr. Jenkins also called as a witness Arthur J. Doyle, KCP & L's president and chief executive officer and, at the time of the taking, KCP & L's general counsel. He testified that on July 10, 1973, KCP & L and SJL & P entered into a commitment to build and operate the generating plant, a matter which at once became public knowledge. In August that year the two companies jointly applied to the Missouri Public Service Commission for a certificate of public convenience and necessity to build and operate the plant at Iatan. In 1977 or 1978, Empire District Electric Company (hereinafter Empire) joined in the agreement. At the time of trial the owners of the property were KCP & L (the majority owner), SJL & P and Empire. Mr. Doyle admitted that each would pay its proportionate share of any verdict in favor of Mr. Jenkins.

KCP & L tendered two instructions which would have directed the jury not to consider enhancement or depreciation in the value of the Jenkins land caused by reason of the power plant project and not to consider any industrial use of the property. The court refused the two instructions and gave defendant's Instruction No. 5, MAI 16.02, which did not instruct the jury to avoid consideration of enhancement or industrial use.

On appeal, KCP & L contends that seven prejudicial errors require reversal and remand. The first three concern evidence of project influence, including (1) evidence of the "planned industrial" rezoning; (2) evidence of KCP & L's efforts to interest industries in locating near the project and the response to those efforts; and (3) evidence of SJL & P and Empire's interest in the project. Points four and six relate to the instructions. Point five complains of evidence showing that SJL & P and Empire agreed to share litigation expenses and pay their proportionate share of the jury award, and point seven asserts judicial error in admitting evidence of the sale of land from Woodrow Wren to Kansas City, said to have been made under threat of condemnation.

The sole issue to be determined at trial was the fair market value of the condemned land on the date of the taking. In its first point on appeal, KCP & L argues that the trial court erred in admitting evidence informing the jury of the rezoning to "planned industrial", and not instructing the jury to disregard the rezoning in reaching the fair market value.

The fair market value of Mr. Jenkins' property depended on its highest and best use. "In determining fair market value, consideration should be given to all uses to which the property may best be applied or

for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the near future ... Zoning is relevant to a property's highest and best use in so far as it may limit or encourage certain uses of property." *State ex rel. State Highway Comm'n v. Berkeley School Dist.,* 618 S.W.2d 195, 198 (Mo.App. 1981). The term "use" encountered in condemnation proceedings "means the permitted utilization made of the property taken under applicable zoning ordinances .... " *State* ex rel. *State Highway Comm'n v. Graeler,* 527 S.W.2d 421, 426 (Mo.App.1975). Hence, evidence of the existing zoning is generally relevant in a condemnation proceeding.

■ In *Greystone Heights Redev. Corp. v. Nicholas Inv. Co., Inc.,* 500 S.W.2d 292 (Mo.App.1973), this court at 297 recognized "the universal principle that the value of land in condemnation is that which it has to the condemnee, not to the condemnor."[1] Nevertheless, that general rule is subject to the considerations of fairness that "[t]he value should be fixed ... with reference to the loss the owner sustains, considering the property in its condition and situation at the time it is taken, and not as enhanced by the purpose for which it was taken." *United States v. Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 76, 33 S.Ct. 667, 677, 57 L.Ed. 1063 (1913). This is the concept referred to as the "project influence" doctrine, on which KCP & L relies.

In Missouri, this doctrine was adopted in *St. Louis Electric Terminal Ry. Co. v. MacAdaras,* 257 Mo. 448, 166 S.W. 307 (1914) (en banc), where the court said at 310:

The proper rule, when the whole property is being taken, is not to allow the jury to consider either enhancements or depreciation brought about by the construction of the improvement for which the property is being taken. In other words, the value should be determined independent of the proposed improvement.

■ Zoning generally falls within the project influence doctrine. "The probability of rezoning (or even an actual change in zoning) *which results from the fact that the project* which is the basis for the taking *was impending,* cannot be taken into account in valuing the property in the condemnation proceeding (emphasis added)." 4 Nichols, Eminent Domain § 12.322[1] at 12–655 (3rd ed. 1981). Fairness dictates such a rule, otherwise, if the rezoning had devalued the property instead of raising its value, charging Mr. Jenkins with the diminution in value would be manifestly unjust. *St. Louis Electric Terminal Ry. Co. v. MacAdaras, supra.* Therefore, if the rezoning of Mr. Jenkins' land resulted from the project itself, evidence of it was incompetent and inadmissible. If the rezoning was not the result of the project, however, it was admissible as relevant to determination of the best and highest use of the property.

■ We must conclude that here, the rezoning was not the result of the project and therefore, was admissible for the reason that it was not necessary to the construction of the steam generating plant itself. Although Platte County is authorized by § 64.620[2] to restrict the use of land within the county, that is, zone the land as it deems advisable, that section provides as well that the powers granted "shall not be construed ... to authorize interference with such public utility services as may have been or may hereafter be authorized or ordered by the public service commission .... " The public service commission is specifically empowered in § 393.170 to grant permission and approval for construction of an electric plant "whenever it shall ... determine that such construction ... is necessary or convenient for the public service." These sections, taken together, nec-

1. The court relied on *Boston Chamber of Commerce v. Boston,* 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910), where Mr. Justice Holmes wrote:

"And the question is, What has the owner lost? not What has the taker gained?"

2. All sectional references are to Revised Statutes of Missouri, 1978, unless otherwise indicated.

essarily mean that the county could not have interfered with the construction of the Iatan Plant by means of its zoning regulations.[3] That being so, the joint application of KCP & L and SJL & P for rezoning of the property was neither a prerequisite to the project, nor necessary to it.[4]

The record leaves little doubt why, although rezoning was unnecessary for construction of the generating plant, KCP & L and SJL & P sought the rezoning. The evidence shows that from the inception of the Iatan project KCP & L's power sales staff promoted sales to firms which would locate at or near the project site. KCP & L's director of area development, Patrick Tansey, Jr., testified that he tried to encourage new businesses to come into the area, knowing that the industries would be attracted by the fact that the power plant was there. A fair conclusion from this and similar evidence is that KCP & L sought rezoning not to construct the plant itself, but to enable it to surround itself with satellite customer industries. The rezoning,

then, was necessary not to generate electricity, but to generate business.

Had that rezoning been obtained by an unrelated industry,[5] without doubt, any enhanced value caused by that rezoning would be relevant to the issue of the fair market value of Mr. Jenkins' land. Although the rezoning here was obtained by the condemnor, the fact remains that it was done to permit that unrelated industry to relocate and, therefore, its legal effect should be equivalent. Rezoning obtained by a condemnor is not automatically "project-related".

■ KCP & L has cited a number of cases in support of the proposition that "[t]he project influence doctrine has been applied to preclude evidence, argument and consideration ... of influence or activity of the project ... upon the highest and best use of property being condemned, upon any reasonable probability of rezoning ... [and] upon actual zoning ...." Every such case cited,[6] indeed, every other case on the subject which diligent search has uncovered, holds "project influence" to include only

3. This is consistent with the interpretation of these sections in *Union Elec. Co. v. Saale,* 377 S.W.2d 427, 430 (Mo.1964), holding that a county cannot by zoning restrictions limit the use of land by a public utility to construct a power plant to generate electric energy for public use.

4. The application of KCP & L and SJL & P to the Public Service Commission for certificates of public convenience and necessity and to the Platte County Planning Commission and the county court for change in zoning are silent as to how many of the 3,115 acres to be rezoned would be devoted strictly to the erection and operation of the steam generating plant. Nor is any mention found in the record of this case as to how much of the land rezoned and acquired by condemnation or otherwise by the electric company was to be devoted to the plant itself and how much, if any, would remain thereafter for disposal to customer industries.

5. KCP & L does not assert that the rezoning could only have been accomplished on its application or that Jenkins, other landowners or other interested industrial firms could not have obtained the change. We note, in fact, that Mr. Jenkins attended the hearing on KCP & L's rezoning application in support of it. In addition, the history of the Iatan project suggests the contrary. The record strongly "indicates a

reasonable probability of a change in the zoning restriction in the reasonably near future". As the court said in *Roach v. Newton Dev. Auth.,* 407 N.E.2d 1251, 1254 (Mass.1980), "even though the actual rezoning was in some sense due to the project" the trial judge in his discretion may admit evidence of the rezoning if it bears on the likelihood that a private developer could have obtained the rezoning.

6. *People v. Arthofer,* 245 Cal.App.2d 454, 54 Cal.Rptr. 878, 885 (1966) ("probability of zone change may not take into account the proposed freeway or any influence arising therefrom"); *Williams v. City and County of Denver,* 147 Colo. 195, 363 P.2d 171, 173–74 (1961) ("as a result of the proposed construction"); *Masheter v. Kebe,* 34 Ohio App.2d 32, 295 N.E.2d 429, 431 (1973) ("zoning was a direct result of the construction ... and would not have existed without the highway"); *State v. Kruger,* 77 Wash.2d 105, 459 P.2d 648, 650 (1969) ("may not ... consider any effect on said zoning created by the project" and "which results from the project which is the basis for the taking"); *State v. Sherrill,* 13 Wash.App. 250, 534 P.2d 598, 605 (1975) ("rezones ... were granted because of the project"). All of these cases involved condemnations by state authorities related to highway projects.

probable rezoning or existing zoning which was the *result of* or was *caused by* the project. No such case involves a rezoning shown to be unnecessary to or not required by the core purpose of the project.

We hold, therefore, that evidence of the rezoning obtained by KCP & L and SJL & P sixteen months prior to the taking was properly admitted by the trial court.

KCP & L contends in point two that evidence of industry inquiries and efforts by the firm's agents to promote the relocation of businesses into the company's certificated area is "attributable to the project", "related" to it and "influenced" by it, and therefore should not have been admitted as relevant to the question of the highest and best use of the property.

■ Consideration of this point turns on how broadly the "project-influence" umbrella extends. Neither side was prepared to show the trial court the periphery of the doctrine or to suggest clear answers to overlapping questions of relevancy. On the one hand, the court was obliged to recognize the rubric of condemnation law that, since property is to be valued as of the time of taking, evidence of conditions and events after that time is usually irrelevant. On the other, the court was aware of the more basic rule that evidence tending to prove the industrial utility of the land and the market for it is relevant and admissible. The court was thus required to exercise its discretion at trial and choose which of these legal courses was the more fair and equitable. *Cf. Roach v. Newton Dev. Auth., supra.* In reviewing a trial court's exercise of judicial discretion an appellate court will determine whether alternative courses or choices were open to the trial judge none of which would yield a result contrary to law. If the reviewing court finds the court had been faced with such a choice between alternative legal rules, the review is complete, and the trial court will be affirmed, regardless of which choice the court made. *In re George,* 630 S.W.2d 614, 622 (Mo.App. 1982).

In picking its way through this slippery area, the court here admitted Mr. Tansey's testimony as to his efforts to encourage businesses to come into the area. He testified, among other things, that the property had many assets to industry, but that the power plant was the only reason any industry would locate there. In determining whether the project-influence doctrine covers this type of testimony, we first note that if it were clear that the *only* reason any industry would have considered the site was to be near the power plant, then such interest would be project-influenced and inadmissible. A comparable situation would be if a marina expressed an interest in condemned land formerly in the middle of a dry and grassy pasture but now, after the construction of a dam, on the banks of a recreationally-suitable lake. Beyond question, no marina would locate on this site absent the condemnation. The project-influence doctrine—concerned with fairness to condemnor and condemnee—would bar evidence in the condemnation case of the marina's interest in the land. KCP & L would have us extend the principle to the case before us where the site has *many* attributes desirable to industry (as indicated by the testimony of KCP & L's consulting firm), *one* of which is the proximity to the Iatan plant.

We decline to do so, primarily because we find KCP & L's position incredible. The jury obviously found it so as well. First, Mr. Jenkins' witnesses testified that the highest and best use of the land was industrial, that it had utility and "availability" to other industrial users because of such attributes as its size, location, and proximity to rail, water and highway transportation, and access to labor supply. Second, one need not be a visionary to perceive the accelerating forty-year growth of industrial, commercial and residential uses of property, formerly mostly agricultural, in the fifty-mile corridor between Kansas City and St. Joseph. The jury may well have been aware that in spite of KCP & L's assertions to the contrary, the steady march of Kansas City to the north and St. Joseph to the south inevitably made Mr. Jenkins' land, nestled between these two slowly-moving

giants, more desirable and more valuable for non-agricultural uses. Third and most persuasive is the irony of KCP & L's position. The firm exerted considerable effort touting the land for its attributes, ticking off other factors in addition to the proximity of the Iatan plant. It now argues that although the land was suitable for an electric generating plant because of the "other factors" testified to by its own experts, and suitable to the potential industrial customers it contacted because of those same factors, it was totally unsuitable for other industrial purposes. The inconsistency of this position is obvious and totally distinguishable from the marina example where without question the lake caused by the dam was the only reason the marina would be attracted to the site. KCP & L's behavior admits that in this case, other reasons abound.

Faced with these ironies, we cannot escape the conclusion that, at the very least, the project-influence doctrine does not immunize the condemnor's conduct from the scrutiny of the jury where it adduces evidence as to the lack of utility of the landowner's property for general industrial uses in a case in which it has promoted the sale and use of the same and nearby land for exactly those uses. We hold that the industrial demand for the property, on these facts, does not fall within the project influence doctrine.

In point three, KCP & L claims that prejudicial error occurred when the trial court allowed the jury to consider evidence that SJL & P had an interest in the project prior to the taking, that KCP & L attempted to sell a part interest in the property to Missouri Power and Light Company (MP & L) and to Associated Electric Cooperative (AEC), and that Empire acquired an interest in the property after the date of taking. KCP & L again maintains that all such evidence was irrelevant because it was project influenced, and that prejudice re-

sulted in allowing the jury to infer that several "deep pockets" were available to pay a large verdict.

As to SJL & P's interest in the site before the taking, we decline to hold that this evidence falls within the project influence doctrine. The general test of admissibility in condemnation cases is whether the evidence tends to help the jury in resolving the issue of value. *State* ex rel. *State Highway Comm'n v. Texaco, Inc.,* 502 S.W.2d 284, 288 (Mo.1973). Evidence of the interest of another power company in the same site would tend to show the jury that the price of the land could have been influenced, absent condemnor's taking, by a competitive interest in the land. This perception is reinforced by *Greystone Heights Redev. Corp. v. Nicholas Inv. Co., Inc.,* supra, at 197, in which this court held that if property has a special utility to other parties in addition to the taker who could use the property for the same purpose intended by the taker, then this special utility may be shown.[7] *Greystone* required that a defendant must "show a reasonable probability that some third party would have made a specially high bid for defendant's land ... had plaintiff's taking by condemnation not occurred, for a purpose competitive to that of plaintiff." *Id.* at 298. Granted, the condemnee has not shown that SJL & P would definitely have submitted such a bid had the condemnation not occurred, but definiteness is not required. *Greystone* requires only a reasonable probability. In light of the fact that the evidence shows that SJL & P was sufficiently interested in the site to attend meetings on its feasibility and commission a report on the suitability of the area for industrial use as well as jointly apply for the certificate of public convenience and necessity and for rezoning, we find that we must not interfere with the discretion of the trial court and the role of the jury in determining just how much

7. Because this language enumerated an exception to the general rule that special usefulness to the condemnor cannot be considered in determining fair market value, KCP & L argues that it does not apply to the project influence doctrine. We see no reason why the exception is not applicable to both rules where the desirable result of putting all relevant evidence before the jury is reached.

weight such a possibility should be given in determining fair market value.

The same logic applies to the admission of evidence of Empire's acquisition of an interest in the property after taking. It, too, goes to the question of competitive interest in the site which could possibly have resulted in a higher bid absent condemnation. Admittedly, such a possibility was more remote than was a bid from SJL & P, but again, the question of whether it was *too* remote to be relevant falls within the discretion of the trial court. Most important, even assuming the discretion was abused, the 3½% interest of Empire is so insignificant that we cannot say that admission of the interest was so prejudicial that, standing alone, it would warrant a new trial.[8]

As to the attempts by KCP & L to sell interests in the project to MP & L and AEC, even if we assume that the admission of such evidence was irrelevant to the issue of fair market value of the property, we cannot find any resulting prejudice. Unlike Empire and SJL & P, which became joint owners of Iatan, MP & L and AEC did not accept KCP & L's offer. Therefore, no "deep pocket" question arises. KCP & L alleges, nevertheless, that prejudice occurred because this evidence emphasized the "industrial theory" and resulted in the high jury award. We assume that the "industrial theory" refers to the condemnee's position that the property was fit for other industrial use. In light of our holding in point two that such evidence was admissible, we cannot find prejudice here.[9]

In points four and six, KCP & L claims the trial court erred in admitting Mr. Jenkins' Instruction No. 5 and refusing its requested Instructions A and B. Instruction No. 5, MAI 16.02, defines fair market value and permits consideration of all the uses to which the property may be adapted now or in the near future.[10] KCP & L's requested Instruction A would have added an admonition not to consider enhancement or depreciation brought about by the Iatan project itself [11] and Instruction B would have told the jury not to consider any industrial use of the property.[12]

In support of its argument that MAI 16.02 should not have been used without modification, KCP & L directs us to *State ex rel. State Highway Comm'n v. Mt. Moriah Cemetery Assoc.*, 434 S.W.2d 470 (Mo. 1968), in which the court held that where no evidence exists of the reasonable market

**8.** See further discussion of the nonprejudicial effect of evidence in regard to SJL & P and Empire, *infra,* in point five.

**9.** Plaintiff also argues that reversible error occurred when the trial court sustained its late objection to this evidence on the basis that it was project influenced, and yet refused its motion to strike. Reversal on such grounds requires a showing of prejudice resulting from the unstricken answers, however, and as discussed above, we find none here.

**10.** Instruction No. 5, MAI 16.02, provides:

The phrase "fair market value" means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and when bought by one willing or desirous to purchase it but who is not compelled to do so.

In determining fair market value you should take into consideration all the uses to which the property may best be applied or for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the near future.

**11.** Requested Instruction A provides:

The phrase "fair market value" means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and when bought by one willing or desirous to purchase it but who is not compelled to do so.

In determining fair market value, you should take into consideration all the uses to which the property could have best been applied or for which it was best adapted, under existing conditions at the time of the taking and under conditions that could then have been reasonably expected in the near future, but you shall not consider any enhancement or depreciation in the value of the property brought about by reason of the Iatan power plant project for which the property was taken.

**12.** Requested Instruction B provides:

In determining the uses to which the property could have best been applied or for which it was best adapted, you may not consider any industrial use of the property.

value of the type of property at issue, MAI 15.02 (now MAI 16.02) is inappropriate. That case is inapplicable here. Unlike a cemetery, Mr. Jenkins' land is not one of those "types of property that [is] not bought and sold on an open market and consequently [does] not have a reasonable market value . . . ." *Id.* at 472.

Additional cases cited by KCP & L finding reversible error in instructions authorizing consideration of project enhancement are similarly inapplicable in that MAI 16.02 does not specifically authorize such consideration and, in fact, does not mention the project at all.

KCP & L's argument that Instruction B should have been given is based on its earlier contention that evidence of industrial demand and the rezoning to "planned industrial" should not have been admitted. In light of our holding in points one and two that such evidence does not fall within the project influence doctrine, KCP & L's contention that Instruction 5 was overly broad must fail.

KCP & L also complains that Instruction No. 5 was fatally flawed in that it led the jury to believe that it had to consider all the uses to which the property could have been applied or was best adapted as of June, 1980, the date of the trial, instead of immediately before the date of the taking, August 29, 1975. We disagree. Instruction No. 4 provided: "You must award defendant such sum as you believe was the fair market value of defendant's property immediately before the taking on August 29, 1975." "It is well established in the history of the law of this state that instructions are considered as a whole . . . and as being given to and considered by jurors of reasonable intelligence . . . ." *McGowan v. Hoffman,* 609 S.W.2d 160, 164 (Mo.App.1980). Reading these instructions as a whole we cannot agree with KCP & L that the jury was confused as to the date on which the property was to be evaluated.

KCP & L's fifth point claims prejudicial error in admitting the testimony of Mr. Doyle, president of KCP & L called as defendant's witness, that SJL & P and Empire were additional sources to pay the verdict and the litigation expenses because such evidence was not relevant and was inflammatory. KCP & L argues that the fact that the jury awarded Mr. Jenkins the highest evaluation estimated by his experts reflects the inflammatory nature of the testimony.

KCP & L cites numerous foreign cases which recognize that the question of who will pay the judgment in a condemnation suit is irrelevant to the only issue in such cases—the fair market value of the condemned property. *See St. Clair Housing Authority v. Quirin,* 379 Ill. 52, 39 N.E.2d 363, 365 (1942); *Mississippi State Highway Comm'n v. Nixon,* 253 Miss. 636, 178 So.2d 680, 682 (1965); *State v. Willey,* 351 S.W.2d 900, 902 (Tex.Civ.App.1961).

Mr. Jenkins attempts to justify the evidence as demonstrating that the property has a special use and adaptability for parties other than KCP & L, citing *Greystone Heights Redev. Corp. v. Nicholas Inv. Co., supra.* Although we have held in point three that the relative interests of SJL & P and Empire may be relevant to this issue, we cannot see how evidence of the agreement to share the verdict award and litigation expenses relates in any way to the availability of the property to other interested parties.

■ Accordingly, we find that the evidence was irrelevant and that its admission was, indeed, error. We also find, however, that *on the unique facts of this case,* the error was not prejudicial. As distinguished from the classic personal injury case where plaintiff's attorney informs the jury that defendant is either a very wealthy man or heavily insured, a clearly prejudicial bit of information, the jury here was simply informed that two other corporations would share in paying *a very small percentage* of the award.

Before Mr. Doyle took the stand, the jury had already heard evidence that SJL & P was a co-owner of the project and that numerous other utilities had been approached to share ownership. No great

leap of imagination or insight was required for the jury to surmise that SJL & P, as co-owner of the project, would be sharing in the cost of acquiring all the property, including that owned by Mr. Jenkins. However, until Mr. Doyle testified, the jury was unaware of the relative percentages of the property owned by the utilities.

This leaves two likely possibilities. Either the jury, if it had not heard Mr. Doyle's testimony, would have gone to the jury room with the erroneous impression (having heard nothing to the contrary) that the ownership was 50/50 and that KCP & L would have to pay only one-half of whatever it awarded Mr. Jenkins, or it would have forgotten SJL & P completely and assumed erroneously that KCP & L would have to pay 100%.

Instead, Mr. Doyle established that the verdict amount would be shared with other utilities and that KCP & L would have to pay 92%. This information, then, either boosted KCP & L's share of the award in the eyes of the jury from 50% to 92%, or reduced it from 100% to 92%. If the former, we cannot see how an awareness that the cost to KCP & L would be *increased,* could have inspired the jury to boost the total award. If the latter, the slight reduction in the percentage borne by KCP & L and the knowledge that two other corporations would, together, bear 8% of the cost, cannot be deemed so prejudicial as to warrant a new trial.

We hold, therefore, that the testimony of Mr. Doyle did not constitute prejudicial error.

In its seventh point, KCP & L complains that the trial court erred in admitting Mr. Jenkins' evidence of a purportedly comparable sale from Woodrow Wren to the City of Kansas City because Mr. Jenkins did not first show that the sale was voluntary.

Crucial to KCP & L's argument is the contention that the Wren sale was made under threat of condemnation to a buyer with eminent domain power.

Generally, to help the jury fix the price of condemned land, the sale price of land similarly situated is admissible. An exception is made, however, for land sold under threat of condemnation, *State* ex rel. *State Highway Comm'n v. Bruening,* 326 S.W.2d 305, 312–14 (Mo.1959), because such sales are in the nature of a compromise. The condemnor may need the property and so may be willing to pay more than the true value or the fear of legal action may compel the owner to accept less than value. These factors make the evidence of such sales incompetent. *Metropolitan St. Ry. Co. v. Walsh,* 197 Mo. 392, 94 S.W. 860 (1906).

In this case, however, the question whether the Wren sale was actually made under threat of condemnation was not clearly resolved at trial.

In arriving at a fair market value of $2,050 an acre for Mr. Jenkins' land, Mr. Jenkins' expert witness, Kenneth Newell, considered the Wren sale. He testified that although the city could have condemned the Wren land, it did not but "stepped forward and bought it." KCP & L's counsel objected to this testimony, asserting that the city had a right to condemn the land and had negotiated the sale under threat of condemnation. The court overruled the objection, stating, "I've heard no evidence that there was any imminence of condemnation in the case in that transaction."[13] A similar exchange occurred when Mr. Jenkins' second expert, Tom Thomas, testified.

Later, KCP & L called its own expert, Curtis Bliss, who testified that the Wren sale was unsuccessfully negotiated by his real estate firm, and that it was returned to the city "for their acquisition." At that point, Mr. Jenkins' experts had already testified but KCP & L made no motion to strike the earlier evidence. On very similar facts, this failure has been held to constitute a waiver of any error, preserving nothing for appellate review. *Board of Public Bldgs. v. GMT Corp.,* 580 S.W.2d 519, 524 (Mo.App.1979).

---

**13.** The mere fact that the buyer had the power of eminent domain does not, in itself, show that a sale was compulsory. *State* ex rel. *State Highway Comm'n v. Bruening, supra,* at 314.

That alone, is a sufficient basis to hold that the trial court did not err in admitting the evidence. But the parties also dispute as to who had the burden of proof of the voluntariness of the sale. KCP & L correctly argues that the ultimate burden rests on the party introducing the sale into evidence and cites *State ex rel. State Highway Comm'n v. Bruening, supra,* as requiring three elements for admission: (1) that the buyer had no fixed purpose to condemn if it could not buy; (2) that no threat of condemnation was involved; and (3) that the sale was otherwise voluntary. Absent such showings by Mr. Jenkins, argues KCP & L, admission of the evidence was reversible error.

Although *Bruening* does require that those elements be established before admission, it does not state that the offeror of the evidence must bear the burden. On the contrary, the next year, the Missouri Supreme Court, in *State* ex rel. *State Highway Comm'n v. Dockery,* 340 S.W.2d 689 (Mo.1960), discussed at great length the question of the burden of proof. The court cited numerous foreign cases holding that, because a freely negotiated sale is the norm in business transactions and because courts recognize the presumption that the conduct of a person is normal, the sale price is presumed to have been freely fixed and not compelled by threat of condemnation. According to those cases, this presumption discharges the offeror's burden of proof of voluntariness, and the burden of going forward with evidence to show that a particular sale was not voluntary shifts to the party opposing the evidence. Although the *Dockery* court did not specifically adopt this "rebuttable presumption" view,[14] the opinion makes clear that it was one of the "considerations" affecting the decision.

Applying the *Bruening* and the *Dockery* decisions, then, we hold that as the opponent of the evidence on the preliminary issue of admissibility, KCP & L bore the burden of going forward to establish that the sale was not voluntary. That burden arose when evidence of the Wren sale was first offered by Mr. Jenkins. The *Bruening* opinion makes clear that this burden must be met before admissibility is determined, and this case graphically demonstrates the wisdom of that rule. The trial court's statement that no evidence of "imminence of condemnation" had been shown should have alerted KCP & L to the fact that, absent such evidence, the testimony would be admitted. Whether alerted or not, however, the opponent of the evidence may not delay his preliminary offer to demonstrate the inadmissibility of the evidence and later point to the admission as grounds for a new trial. KCP & L's failure to come forward and rebut the voluntariness of the sale before evidence of the sale was heard precludes its present complaint.

KCP & L argues as well that even if we accept the "rebuttable presumption" as the law in Missouri, Mr. Jenkins' evidence by two witnesses of "stated ignorance of whether the sale occurred under threat of condemnation" is adequately rebutted by its witness, Mr. Bliss, who knew "first-hand" of the involuntary nature of the sale. We disagree. First, we note that the trial court apparently did not find the testimony of Mr. Bliss inherently more convincing. Second, the record does not show that Mr. Bliss had first-hand knowledge of the sale itself, but only that he knew that his firm referred the sale back to the city after negotiations failed. Third, the court in *Dockery* addressed the issue of admitting expert testimony where the witness concedes that he does not know the circumstances surrounding the sale, and concluded at 695 that such admission is not error:

> While an expert witness should have made careful inquiry into the facts upon which he bases his opinion and should know whether a similar sale he mentions was or was not voluntary, still we are of the view that it was not error in this case for the trial court to have admitted the

---

14. This view *is* specifically adopted by the Eastern District in *Board of Public Bldgs. v.*

*GMT Corp., supra,* at 523.

evidence as to similar sales ... even though the offerer of that evidence did not adduce affirmative proof that the sales were voluntary where, as here, there was nothing to indicate that the sales were not voluntary and where, as here, the evidence was offered as one of the factors which the expert witnesses considered, along with others, in arriving at their ultimate opinions as to the value of the property at the time of taking.

Here, as in the *Dockery* case, evidence of the comparable Wren sale was only one of the factors which the experts considered. Accordingly, we conclude that the trial court did not err in admitting evidence of the sale of the Wren property.

For the foregoing reasons, we hold that rezoning unnecessary to the project for which the property is condemned is not protected by the project influence doctrine, neither is industrial demand for the property generated by the condemnor for reasons not directly related to the project; that evidence of the interest of other utilities in the site was not prejudicial on these facts; that submission of MAI 16.02 and refusal of plaintiffs' alternative instructions was not error; that evidence of an agreement by other utilities to pay a percentage of litigation expenses and the verdict award was not prejudicial; and that evidence of the sale of the Wren property was properly admitted.

The judgment is affirmed.

All concur.