PIEDMONT TRIAD REGIONAL WATER AUTHORITY, Plaintiff v. LINDA H. UNGER AND WOLFY UNGER, Defendants

No. COA02-201

(Filed 17 December 2002)

**Eminent Domain— condemnation—regulatory taking—watershed protection ordinance—valuation of property**

The trial court erred by concluding that the Watershed Critical Area (WCA) ordinance designed to protect existing and proposed watersheds, as applied to defendants' property, was not caused by the Randleman dam reservoir project and therefore limited the value of defendants' property condemned by plaintiff regulatory agency as of the date of the taking, because: (1) the WCA ordinance has no definition or meaning with respect to defendants' property without reference to the proposed Randleman dam project; and (2) the Randleman dam project caused the passage of the WCA ordinance as it applies to defendants' property, and therefore, defendants are entitled to introduce evidence of the property's value before the development and density restrictions were adopted under N.C.G.S. § 40A-65.

Appeal by defendants from judgment entered 19 December 2001 by Judge Peter M. McHugh in Guilford County Superior Court. Heard in the Court of Appeals 14 November 2002.

_____

*Roberson Haworth & Reese, P.L.L.C., by Robert A. Brinson, for plaintiff-appellee.*

*Wyatt Early Harris Wheeler, LLP, by Scott F. Wyatt, for defendants-appellants.*

TYSON, Judge.

## I. Background

In 1984, the Guilford County Board of Commissioners ("Commissioners") adopted its first countywide watershed protection ordinance. At the time, the following watersheds were designated: Greensboro, High Point, Jamestown, Lake Mackintosh, Reidsville, and Pole Cat Creek. In August 1985, the Commissioners designated the Randleman Dam watershed, whose boundaries included a portion of 94.11 acres of property owned by Linda H. and Wolfy Unger, ("defendants"). As of October 1985, Guilford County had also designated the Sandy Creek watershed. Of the nine watersheds so designated, five, Greensboro, High Point, Jamestown, Lake Mackintosh, and the proposed Randleman watershed, have reservoirs located within or a proposed reservoir to be located within Guilford County.

In April 1987, the Commissioners amended the 1984 watershed protection ordinance by creating the Watershed Critical Area ordinance ("WCA") to protect existing and proposed watersheds. The proposed Randleman Dam watershed is specifically referred to in the WCA and is the only watershed that affects defendants' property. The WCA ordinance established a four-tier development restriction on lands adjacent to or in close proximity to the actual and proposed lake reservoirs as follows:

Tier 1— includes those lands within 200 feet of the normal pool elevation. This tier is intended for public ownership, and no development of any kind is allowed.

Tier 2— includes those lands beyond Tier 1 but within 750 feet of the normal pool elevation. Development in Tier 2 is limited to one dwelling unit per five acres of land.

Tier 3— includes those lands lying beyond Tier 2 but within 3,000 feet from the normal pool elevation. Development in Tier 3 is limited to one dwelling unit per three acres of land.

Tier 4— includes those lands beyond Tier 3 but within the critical watershed area boundary. Development is limited to one dwelling unit per acre.

As applied to defendants' property, the "normal pool elevation" projects the average lake levels after construction of the proposed Randleman dam lake reservoir. The defendants' property lies within Tiers 1 through 3, and its density of development is restricted by measuring its proximity to the proposed Randleman dam watershed lake.

On 28 June 2000, Piedmont Triad Regional Water Authority, ("PTRWA") condemned approximately 19.513 acres of defendants' property located within Tier 1. Defendants, pursuant to N.C.G.S. § 40A-47, moved the court to judicially determine whether the application of the WCA to defendants' property was caused by the proposed Randleman Dam project. Plaintiff and defendants presented expert testimony to the court on 21 August 2001.· The trial court found that the WCA ordinance, as applied to defendants' property, was not caused by the Randleman dam project. The trial court certified its ruling for appellate review. Defendants appeal.

Plaintiff moved to dismiss defendants' appeal contending it is premature and interlocutory in nature. We disagree. The trial court certified its order for appeal pursuant to Rule 54(b) of the North Carolina Rules of Civil Procedure. Also, the issue affects a substantial right, the valuation of defendants' property.

## II.  Issue

The question before us is whether the application of Guilford County's WCA ordinance to defendants' property was caused by the proposed Randleman dam reservoir project. If so, defendants would be allowed to present evidence of their property's value prior to adoption of the ordinance. If not, defendants are limited to the property's value as of the date of the taking.

## III.  The Takings Clause

The power of eminent domain is inherent to the sovereign and recognized by all fifty states and the federal government. David A. Dana & Thomas W. Merrill, *Property: Takings* 3 (2002); *Kohl v. United States*, 91 U.S. 367, 371-75, 23 L. Ed. 449, 451-52 (1875). The Takings Clause is embodied in the Fifth Amendment of the United States Constitution and mandates the government pay "just compen-

sation" to the owner when the government uses its power to take private property for a public use. U.S. Const. Amend. V. "The Fifth Amendment's guarantee . . . was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 4 L. Ed. 2d. 1554, 1561 (1960).

The Fifth Amendment of the U.S. Constitution applies to the states through the Due Process clause of the Fourteenth Amendment. *Chicago B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 41 L. Ed. 979 (1897). "[A]lthough the North Carolina Constitution does not contain an express provision prohibiting the taking of private property for public use without payment of just compensation, [the N.C. Supreme] Court has inferred such a provision as a fundamental right integral to the 'law of the land' clause in article I, section 19 of [the North Carolina] Constitution." *Finch v. City of Durham*, 325 N.C. 352, 362-63, 384 S.E.2d 8, 14, *reh'g denied*, 325 N.C. 714, 388 S.E.2d 452-53 (1989) (citing *Long v. City of Charlotte*, 306 N.C. 187, 196, 293 S.E.2d 101, 107-08 (1982)).

Over the years, the Takings Clause has been extended to provide relief to private property owners whose property is regulated under the police power. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 67 L. Ed. 322, 326 (1922) ("if regulation goes too far it will be recognized as a taking.")

Extensive litigation has occurred in the field of regulatory takings. The results of the litigation rest on "essentially ad hoc, factual inquiries." *Tahoe Sierra P. Council v. Tahoe RPA*, 535 U.S. 302, ——, 152 L. Ed. 2d. 517, 528 (2002) (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 57 L. Ed. 2d 631, 648 (1978). A property owner must show that a regulation deprives the owner of all economically beneficial or productive use of the land for the regulation to constitute a taking. *Lucas v. So. Carolina Coastal Council*, 505 U.S. 1003, 1019, 120 L. Ed. 2d 798, 815 (1992).

Because challenges to regulatory takings are difficult for property owners to mount, many states have enacted statutes to safeguard both property owners and condemnors from the effect of property value fluctuation due to regulations, if these regulations were implemented for future condemnation. These statutes, known as "scope of the project" statutes, bar evidence of increases and decreases in

property values that are caused by or resulted from the project from factoring into the valuation of the property. *See* N.C.G.S. § 40A-65(a).

## IV.  N.C.G.S. § 40A-65(a)

The N.C. General Assembly enacted N.C.G.S. § 40A-65 in 1981. The statute states:

> Effect of condemnation procedure on value. (a) The value of the property taken, or of the entire tract if there is a partial taking, does not include an increase or decrease in value before the date of valuation that is caused by: (i) the proposed improvement or project for which the property is taken; (ii) the reasonable likelihood that the property would be acquired for that improvement or project; or (iii) the condemnation proceeding in which the property is taken.
>
> (b) If before completion the project is expanded or changed to require the taking of additional property, the fair market value of the additional property does not include a decrease in value before the date of valuation caused by any of the factors described in subsection (a), but does include an increase in value before the date on which it became reasonably likely that the expansion or change of the project would occur, if the increase is caused by any of the factors described in subsection (a).
>
> (c) Notwithstanding subsections (a) and (b), a decrease in value before the date of valuation which is caused by physical deterioration of the property within the reasonable control of the property owner, and by his unjustified neglect, may be considered in determining value.

N.C.G.S. § 40A-65 (2001).

N.C.G.S. § 40A-65 is a scope of the project statute intended to level the playing field and ensure that neither party receives a windfall as a result of the condemnation. Section (a) unambiguously requires that the value of the property taken not reflect increases or decreases in value caused by the project for which the property is taken or where there is the reasonable likelihood that the property would be acquired for that project.

## V.  Unity of Condemnor and Zoning Authority

The trial court concluded that "[t]here is no identity or unity between Guilford County as the zoning authority and PTWRA as the

condemnor . . ., both the zoning authority and the condemnor being separate independent governmental entities". The trial court concluded that the lack of "identity or unity" between the regulating and condemning entities prevented the statute's applicability to the facts at bar.

N.C.G.S. § 40A-65 does not require unity between the condemnor and the entity adopting the regulation in order for the statute to apply. Prior cases addressing N.C.G.S. § 40A-65 did not reach the question of unity because the increases or decreases in value did not result from zoning changes. *See City of Durham v. Woo*, 129 N.C. App. 183, 497 S.E.2d 457, *cert. denied*, 348 N.C. 496, 510 S.E.2d 380-81 (1998); *See also Raleigh-Durham Airport Authority v. King*, 75 N.C. App. 57, 330 S.E.2d 622 (1985).

We review extra-jurisdictional case law in search of support for the trial court's rationale. Many states have enacted variations of N.C.G.S. § 40A-65, or scope of the project rules. Defendants cite a line of cases from courts in other states who examined similar laws. *See Paradise Valley v. Young Financial Servs.*, 868 P.2d 971 (Ariz. Ct. App. 1993), *review denied* (Ariz. Mar. 16, 1994); *Kansas City Power & Light Co. v. Jenkins*, 648 S.W.2d 555 (Mo. Ct. App. 1983); *Masheter v. Kebe*, 295 N.E.2d 429 (Ohio Ct. App. 1973), *aff'd*, 359 N.E.2d 74 (Ohio 1976); *Williams v. City & County of Denver*, 363 P.2d 171 (Colo. 1961).

The case of *Masheter v. Kebe* provides insight on the particular issue of condemnor/regulator unity. The property owner-appellant, Kebe, owned a 37-acre tract of undeveloped land on the northerly side of Detroit Road in Westlake, Ohio. *Kebe*, 295 N.E.2d at 430. Prior to 24 July 1970, the property was zoned in part for apartment use and in part for single family use. *Id.* On 24 July 1970, the City of Westlake adopted a zoning ordinance which zoned substantially all of the two residues of property for highway interchange services, such as gas stations and motels. *Id.* The Director of Highways condemned sixteen acres through the middle of the property for construction of Interstate highway 90, ("I-90") on 27 October 1970. *Id.* The trial court ordered the parties to value the property as of 27 October 1970 with the uses permitted by the zoning existing on that date. *Id.* at 431.

The Ohio Court of Appeals recognized that without the I-90 construction, the re-zoning would not have occurred and held that the "familiar rule that property taken by condemnation proceedings should be valued irrespective of the effects of the improvement upon

it . . . applies to considering a zoning change connected with and brought about by the improvement." *Id.* The court upheld the applicability of the scope of the project rule although the condemning entity and the zoning entity were separate and distinct. *Id.* at 430.

The more recent case of *City of Boulder v. Fowler Irrevocable Trust 1992-1*, 53 P.3d 725 (Colo. Ct. App. 2002), *cert. denied* (Colo. Aug. 26, 2002) is factually similar to the case at bar. The city of Boulder filed condemnation proceedings to take the trust's land for a flood control project. *Boulder*, 53 P.3d at 726. Most of the land "was designated on the flood insurance rate map of the Federal Emergency Management Agency (FEMA) as being in Zone A, the floodway of Goose Creek." *Id.* at 726-27. The property was identified in Boulder's floodplain ordinances as being located in "a high flood hazard zone." *Id.* at 727. The parties stipulated that property development was "essentially prohibited" because of these designations. *Id.* The trial court found that before the 1980s, the property was designated by FEMA as "being in Zone B, which meant that it was subject to some flooding but that the owner was free to develop and build on the property without significant limitation." *Id.* The trial court found that the change in designation to Zone A was a direct result of Boulder's flood control project. *Id.* The Court of Appeals affirmed the trial court's holding that "because the designations reducing the value of the property resulted from the project for which the property was being taken, they could not be considered in valuing the property." *Id.*

The *Boulder* court did not address the lack of unity between the condemning authority, the city of Boulder and the designating authority, FEMA. The court's holding shows that the lack of unity did not prevent the application of the scope of the project doctrine.

Plaintiff cites hornbook authority that the sole exception to collaterally attacking a zoning ordinance is "where the condemnor and the zoning authority are identical." 4 Julius L. Sackman, *Nichols on Eminent Domain* § 12C.03[1] n.9 (rev. 3d ed. 2001). Large scale public improvement projects, such as the Randleman dam, require approvals and funding from a multitude of local, state, and federal entities. Expert testimony showed that the Randleman dam project had been active for at least 25 years. Although plaintiff is the sole condemning authority for the Randleman dam project, other governmental entities have been deeply involved in the planning, approval, and funding process. The unity rule could defeat the purpose of the statute and allow the condemnor to use the actions

of another authority as a proxy to affect the value of the property through restrictions, and permit the condemnor to take the property at a potentially reduced value. We hold that N.C.G.S. § 40A-65 does not require unity of the condemning entity and the zoning entity for its applicability.

## VI. Collateral Attack on Zoning

The trial court concluded as a matter of law that the defendants' motion for judicial determination collaterally attacked the Watershed Protection Ordinance, the Randleman Designation and the WCA Ordinance. We review conclusions of law *de novo* and disagree with the trial court's interpretation.

The motion filed by defendants relates strictly to the applicability of N.C.G.S. § 40A-65 to the valuation of condemned property. N.C.G.S. § 40A-65 becomes applicable only when condemnation proceedings have been initiated. The statute is not a device for property owners to escape timely seeking relief from zoning restrictions.

Because the statute requires an actual condemnation action to have commenced, the present action is not a belated attack on a prior zoning ordinance. Defendants did not attack the WCA zoning ordinance. Defendants have only asserted that the proposed Randleman dam project caused the zoning that influenced the value of their condemned property.

## VII. Structure of WCA Ordinance

The critical issue is whether the proposed Randleman dam caused the WCA ordinance to be applied to defendants' property. The language of the WCA ordinance shows that but for the Randleman dam project, the WCA ordinance, as written, would not exist.

The WCA ordinance zones affected property according to a Tier system. The tiers are measured from a lake elevation pool. This pool is the proposed Randleman lake and not the Deep River that partially adjoins defendants' property. Tiers 1, 2, and 3 have no point of reference to defendants' property other than as measured by normal pool elevation of the proposed Randleman dam lake. Tier 1 provides that "no development of any kind is allowed" and that property located in "[t]his tier is intended for public ownership."

The trial court concluded a lack of causation existed based upon its factual finding that absent the adoption of the WCA ordinance, the State of North Carolina would have enacted its own minimum

requirements for the protection of the designated watersheds' water supply. While there is substantial evidence in the record to support this finding, it does not support nor compel the conclusion of law reached by the trial court.

If the WCA ordinance had not been adopted, the State could have restricted land for the protection of the water supply. Defendants' property may or may not have been restricted under any state regulation. More importantly, defendants' property would not be restricted under the WCA's Tier system, without the proposed Randleman dam project.

The WCA ordinance has no definition or meaning with respect to defendants' property, without reference to the proposed Randleman dam project. Whether some other ordinance might have been passed regardless of the Randleman dam project is immaterial to whether the WCA ordinance, as it affects defendants' property, was caused by the Randleman dam project.

N.C.G.S. § 40A-65 excludes changes in the value of property caused by the condemnation project. At bar, the statute allows evidence of the value of defendants' property prior to the adoption of the WCA zoning ordinance to be introduced and considered.

## VIII. Conclusion

We hold that the Randleman dam project caused the passage of the WCA ordinance as it applies to defendants' property. Defendants are entitled to introduce evidence of the property's value before the development and density restrictions were adopted pursuant to N.C.G.S. § 40A-65(a). We reverse the order of the trial court and remand for further proceedings consistent with this opinion.

Reversed and remanded.

Judges WALKER and McCULLOUGH concur.