STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION AND OCEAN CLUB VENTURES, LLC, PETITIONERS v. BUCK ISLAND, INC., INTERVENOR-RESPONDENT

No. COA03-198

(Filed 17 February 2004)

## 1. Administrative Law— aggrieved party—standing

Intervenor-respondent company which was brought into the pertinent litigation against its will had standing to appeal the Utility Commission's determination that it was a public utility and that the Utilities Commission obtained the power and authority to supervise and control it, because: (1) intervenor-respondent was an aggrieved party since the Commission's jurisdiction impacted its legal rights; and (2) upon issuance of the Commission's final order, intervenor-respondent's right to appeal from the previous orders was ripe.

STATE EX REL. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

### 2. Utilities— public utility—water and sewage service

The Utilities Commission did not err by concluding that intervenor-respondent company, a real estate developer, was a public utility as defined under N.C.G.S. § 63-3(23)a, because: (1) although a service may be offered to a definable class rather than to the public at large, it still may be considered an offering of service to the public within the meaning of the regulatory statutes; (2) the statute does not require the sale of utility service, but only that utility service is furnished to or for the public for compensation; (3) evidence of the tap fees received by intervenor-respondent is substantial, competent, and material evidence supporting the Commission's conclusion that appellant receives compensation for the utility services; and (4) intervenor-respondent and another company own and control the backbone water and sewer facilities, they have continuing responsibility in regard to maintenance and expansion of the facilities, they control the manner in which the facilities are used, and purchasers of the pertinent lots have access to the utilities as a matter of right.

### 3. Utilities— public utility—expansion of backbone facilities

The Utilities Commission did not err by modifying the Utility Systems Operating Agreement to require it to expand the backbone facilities that provided the water supply and wastewater treatment systems of the pertinent developments upon demand by Carolina Water Service (CWS), because: (1) rather than granting CWS authority to demand expansion of the backbone facilities to serve the pertinent development, the Commission ordered the pertinent developer to obtain the capacity needed for the development before CWS was required to serve it; (2) public utilities have an obligation to provide adequate, efficient, and reasonable service; and (3) the Commission has the power and authority to modify or abrogate contracts of a public utility if they do not serve the public welfare.

### 4. Constitutional Law— taking of property—impairment of contractual rights—expansion of backbone facilities

The Utilities Commission's 20 March 2001 and 1 April 2002 orders requiring intervenor-respondent company to expand the backbone facilities that provided the water supply and wastewater treatment systems of the pertinent developments did not constitute an unlawful taking of property nor an unlawful impairment of its contractual rights, because: (1) intervenor-respondent

STATE EX REL. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

was not required to use the pertinent property in any manner inconsistent with its previous obligations under the Utility Systems Operating Agreement; (2) the Commission did not force a change in intervenor-respondent's contractual commitments; (3) the Commission's orders did nothing to deprive intervenor-respondent of the beneficial enjoyment of the land on which the backbone facilities are located; (4) intervenor-respondent is a de facto public utility and the Commission has authority to regulate the services and operations of public utilities; and (5) impairment of the contract was reasonable and necessary to serve the public interest, and therefore, does not violate the contracts clause.

**5. Utilities— water and sewer facilities—interlocutory orders**

The Utilities Commission's conclusion that complainant-cross-appellant company must provide its own water and sewer facilities was not inconsistent with the Commission's prior interlocutory orders and was not arbitrary or capricious.

**6. Utilities— water and sewer facilities—public utility law**

The Utilities Commission's conclusion that complainant-cross-appellant company must provide its own water and sewer facilities was not inconsistent with prevailing principles of public utility law, because: (1) the Commission's order did not leave the company without options, but only required that it pay the owners of the backbone facilities to provide additional capacity or build its own facilities; and (2) once adequate capacity is present, the pertinent water company is still required to provide reasonable utility service.

**7. Utilities— water and sewer service—jurisdiction**

The Utilities Commission's 19 August 2002 order did not constitute an effective abandonment of the Commission's jurisdiction over the provision of water and sewer utility service within the pertinent development, because the Commission can still take action if the two pertinent companies fail to comply with any of the Commission's orders since the Commission may at any time rescind, alter, or amend any order or decision after notice to the parties and a hearing.

Appeal by Buck Island, Inc. from orders entered 20 March 2001, 1 April 2002, 19 August 2002 and 19 December 2002 by North Carolina Utilities Commission. Heard in the Court of Appeals 16 September 2003.

STATE EX REL. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

*Public Staff Chief Counsel Antoinette R. Wike and Staff Attorney Elizabeth D. Szafran, for intervenor/appellee North Carolina Utilities Commission.*

*Hunton & Williams, by Edward S. Finley, Jr., for appellee Carolina Water Service, Inc.*

*John S. O'Connor for intervenors/appellee Monteray Shores, Inc. and Robert R. and Laurie T. DeGabrielle.*

*Trimpi, Nash & Harman, L.L.P., by Thomas P. Nash, IV and John G. Trimpi, for appellant Buck Island, Inc.*

*Nelson Mullins Riley & Scarborough, L.L.C., by James H. Jeffries IV, for complainant/cross appellant Ocean Club Ventures, LLC.*

MARTIN, Judge.

Appellant Buck Island, Inc. ("Buck Island"), successor in interest to Ship's Watch, Inc., and Monteray Shores, Inc. ("Monteray Shores"), developers of residential and commercial developments known as Buck Island and Monteray Shores, near Corolla, North Carolina, constructed and installed a water and sewage system to jointly serve their developments. In 1988, Buck Island and Monteray Shores entered into a Utility System Operating Agreement ("USOA") with Carolina Water Service, Inc. of North Carolina ("CWS") giving CWS title to the water mains and lines while retaining ownership of what was referred to as the "backbone facilities," the water supply and treatment system and the central wastewater treatment and disposal system. CWS, a public utility, was the exclusive operator of the system. Pursuant to the agreement, Buck Island and Monteray Shores were not responsible for any future construction of facilities in the event of any delay or cessation of development of the service area.

Monteray Shores, whose only shareholders were Robert and Laurie DeGabrielle, was to be developed in three phases. Phases I and II were developed as planned, but the Phase III property was foreclosed on by the original owners, Whalehead Properties. In May 1999, Ocean Club Ventures, L.L.C. ("OCV") acquired an interest in this portion of the property, calling its new development Corolla Shores.

In March 2000, OCV requested water and sewer service from CWS through an interconnection with the backbone facilities of Monteray

Shores and Buck Island. With the existing facilities, there was insufficient capacity to serve the customers in Corolla Shores at its anticipated full build-out of 224 residential units. After failed negotiations with Monteray Shores to expand the backbone facilities, OCV petitioned the Utilities Commission on 26 May 2000 to require CWS to provide water and sewer service to Corolla Shores. CWS, although willing to serve Corolla Shores, explained that because it did not own the backbone facilities it was unable to expand them to accommodate Corolla Shores. On 4 August 2000, the Commission allowed a motion to intervene, filed by Monteray Shores and Robert and Laurie DeGabrielle, over objections by OCV.

On 20 March 2001, the Utilities Commission ordered Monteray Shores and Buck Island to develop a plan to extend service to Corolla Shores under reasonable terms and to bring the facilities used to provide water and sewer service in Buck Island and Monteray Shores under common ownership and control. The order also required the parties to determine the amount OCV should pay for construction of the expanded facilities. In addition, the Commission concluded that Monteray Shores was a public utility as defined by N.C. Gen. Stat. § 62-3(23)a.2, and that Buck Island "appeared to be in the same category."

After additional filings, hearings and comments from OCV, CWS, Monteray Shores and Buck Island, the Utilities Commission issued an order on 1 April 2002 addressing contracts and related issues. The order declared that Buck Island was a public utility by virtue of its part ownership and control of the backbone facilities and thus, Buck Island was subject to the jurisdiction of the Commission. In addition, the order, *inter alia*, designated CWS as the public utility authorized to provide service to Buck Island, Corolla Shores and Monteray Shores, and that the facilities available to provide service in all three developments should be operated in a unified fashion.

Buck Island appealed from the 20 March 2001 and 1 April 2002 orders of the Utilities Commission declaring it to be a public utility. This Court dismissed the appeal as interlocutory on 17 June 2003. *State ex rel. Utils. Comm'n v. Buck Island, Inc.*, 158 N.C. App. 536, 581 S.E.2d 122 (2003).

After receiving additional motions and comments from the parties in response to the 1 April 2002 order, the Commission concluded, in an order dated 19 August 2002, that it was reasonable to intercon-

STATE ex rel. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

nect the facilities serving the three developments and for CWS to operate them as a single system, that CWS had no obligation to serve Corolla Shores until OCV built or obtained the required capacity, and that OCV had the choice of whether to construct its own facilities or whether to negotiate with Monteray Shores and Buck Island to expand the existing facilities. OCV filed a motion for reconsideration of the order, claiming the Commission, in requiring OCV to obtain the expansion needed to serve Corolla Shores, had effectively reversed its prior orders on the issue without explanation. After allowing responses, the Commission denied the motion, explaining that its decision was not inconsistent with previous orders.

Buck Island appeals from the 19 August 2002 order which affirmed the Commission's prior 1 April 2002 decision declaring Buck Island a public utility. In addition, Buck Island appeals from the 20 March 2001 order, contending the Commission modified its contractual rights and obligations and unconstitutionally confiscated its property.

OCV cross appeals, contending the Commission's order was inconsistent with its previous orders as well as contrary to prevailing principles of utility law. OCV also asserts that the Commission did not resolve the issues and thus abandoned its jurisdiction.

## Appeal of Buck Island, Inc.

### I.

[1] Contending that Buck Island has not been aggrieved by the Commission's decision, appellees raise the threshold issue of whether appellant Buck Island has standing to appeal. "In order to have standing to appeal, a party must not only file notice of appeal within 30 days, but must also be aggrieved." *State ex rel. Utilities Comm. v. Carolina Utility Cust. Assn.*, 104 N.C. App. 216, 218, 408 S.E.2d 876, 877 (1991), *disc. review denied*, 330 N.C. 618, 412 S.E.2d 95 (1992); N.C. Gen. Stat. § 62-90(a) (2003). Although the phrase "aggrieved party" has no technical meaning and "depends on the circumstances involved," *In re Assessment of Sales Tax*, 259 N.C. 589, 595, 131 S.E.2d 441, 446 (1963), the Administrative Procedure Act provides guidance as to the intent of the General Assembly in its definition of "person aggrieved" as "any person or group of persons of common interest directly or indirectly affected substantially in his or its person, property, or employment by an administrative decision." N.C.

STATE ex rel. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

Gen. Stat. § 150B-2(6) (2003). In addition, in *Assessment of Sales Tax*, the North Carolina Supreme Court defined an "aggrieved person" as one "adversely affected in respect of legal rights, or suffering from an infringement or denial of legal rights." *Assessment of Sales Tax*, 259 N.C. at 595, 131 S.E.2d at 446.

Buck Island, although admittedly not a party to the original proceeding before the Utilities Commission, was brought into the litigation between OCV and CWS against its will. By declaring Buck Island a public utility, the Utilities Commission obtained the power and authority to supervise and control it, N.C. Gen. Stat. § 62-30 (2003), including, *inter alia*, reserving the right to determine whether the agreement between Buck Island, Monteray Shores and CWS should be recognized, abrogated, or modified. Subjecting Buck Island to the Commission's jurisdiction impacted its legal rights; therefore, Buck Island is an aggrieved party.

An appeal of right lies from any final order of the Utilities Commission. N.C. Gen. Stat. § 7A-29(a) (2003). Buck Island appeals from the orders of 20 March 2001, 1 April 2002, and the final judgment of 19 August 2002 which disposed of all the issues and left nothing to be judicially determined between the parties. *See Veazey v. Durham*, 231 N.C. 357, 361-62, 57 S.E.2d 377, 381, *reh'g denied*, 232 N.C. 744, 59 S.E.2d 429 (1950). Upon issuance of this final order, Buck Island's right to appeal from the previous orders is ripe. N.C. Gen. Stat. § 62-90(a) (2003).

## II.

The scope of appellate review of the decisions of the North Carolina Utilities Commission is codified in N.C. Gen. Stat. § 62-94 (2003). Pursuant to § 62-94(b), the reviewing court:

> may reverse or modify the decision [of the Utilities Commission] if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional provisions, or
>
> (2) In excess of statutory authority or jurisdiction of the Commission, or
>
> (3) Made upon unlawful proceedings, or
>
> (4) Affected by other errors of law, or

STATE ex rel. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

On appeal, findings of fact made by the Utilities Commission are considered prima facie just and reasonable. N.C. Gen. Stat. § 62-94(e) (2003). The role of the appellate court is to determine, after reviewing the entire record, "whether the Commission's findings and conclusions are supported by substantial, competent, and material evidence." *State ex rel. Utilities Comm. v. Piedmont Nat. Gas Co.*, 346 N.C. 558, 569, 488 S.E.2d 591, 598 (1997). However, the Court "may not replace the Commission's judgment with its own when there are two reasonably conflicting views of the evidence." *State ex rel. Utilities Comm. v. Public Staff*, 123 N.C. App. 43, 46, 472 S.E.2d 193, 196 (1996). Having determined the appropriate standard of review, we turn now to the merits of the case.

## III.

[2] Buck Island first argues that the Utilities Commission erred in concluding that it is a public utility. N.C. Gen. Stat. § 62-3(23)a (2003) defines a "public utility" as, *inter alia*:

a person, whether organized under the laws of this State or under the laws of any other state or country, now or hereafter owning or operating in this State equipment or facilities for:

. . .

2. Diverting, developing, pumping, impounding, distributing or furnishing water to or for the public for compensation; or operating a public sewerage system for compensation . . .

The plain language of the statute encompasses both the ownership and operational elements of the utility service.

Buck Island does not challenge the findings of fact contained in any of the Commission's orders from which they appeal. "The appellant shall not be permitted to rely upon any grounds for relief on appeal which were not set forth specifically in his notice of appeal." N.C. Gen. Stat. § 62-94(c) (2003). Therefore, the findings of fact are binding on appeal. In its findings of fact, the Commission determined, *inter alia*, that Buck Island owned a twenty-two percent interest in the facilities used to produce water and treat sewage in the Buck Island and Monteray Shores developments and that the existence of

these systems heightened its real estate development activities. In addition, the Commission found that Buck Island received tap fees from purchasers of lots within the Buck Island development.

Buck Island argues that these findings of fact do not support the Commission's conclusion that it is a public utility. Buck Island concedes it is part owner of the backbone facilities but contends that because it does not sell water and sewer service to the public, it does not meet the statutory definition of a public utility.

Although Chapter 62 of the North Carolina General Statutes does not define "public," our Supreme Court has examined the meaning of "public" in previous cases. In *Utilities Commission v. Telegraph Co.*, 267 N.C. 257, 268, 148 S.E.2d 100, 109 (1966), the Court concluded that:

> One offers service to the "public" within the meaning of this statute when he holds himself out as willing to serve all who apply up to the capacity of his facilities. It is immaterial, in this connection, that his service is limited to a specified area and his facilities are limited in capacity.

The Court has reasoned that "although a service may be offered only to a definable class, rather than to the public at large, it still may be considered an offering of service to the 'public' within the meaning of the regulatory statutes." *State ex rel. Utilities Comm. v. Mackie*, 79 N.C. App. 19, 26, 338 S.E.2d 888, 893-94 (1986), *modified*, 318 N.C. 686, 351 S.E.2d 289 (1987). In *Simpson*, the Court determined,

> whether any given enterprise is a public utility within the meaning of a regulatory scheme does not depend on some abstract, formulistic definition of "public" to be thereafter universally applied. What is "public" in any given case depends rather on the regulatory circumstances of that case. Some of these circumstances are (1) nature of the industry sought to be regulated; (2) type of market served by the industry; (3) the kind of competition that naturally inheres in that market; and (4) effect of non-regulation or exemption from regulation of one or more persons engaged in the industry. The meaning of "public" must in the final analysis be such as will, in the context of the regulatory circumstances, . . . accomplish "the legislature's purpose and comport with its public policy."

*Simpson*, 295 N.C. 519, 524, 246 S.E.2d 753, 756-57 (1978) (citation omitted).

Looking at the circumstances of the case under the *Simpson* factors, water production and sewer treatment, both classic utility functions, are usually considered monopolies because of the intensive capital investment required. In the present case, the Commission found that although service is offered to a definable area, anyone purchasing a lot in the Buck Island development is entitled to connect to the water and sewer systems as long as sufficient capacity exists. Non-regulation of the utility services owned by Buck Island and Monteray Shores would allow these owners to take any action they desired including rate changes, denying access to end users in the developments or abandonment of the service. Thus, analyzed under the *Simpson* factors, Buck Island is a public utility.

In addition, the statute does not require the sale of utility service, only that utility service is furnished "to or for the public for compensation." N.C. Gen. Stat. § 62-3(23)a.2 (2003). Evidence of the tap fees received by Buck Island is substantial, competent, and material evidence supporting the Commission's conclusion that appellant receives compensation for the utility services.

Buck Island relies on *Utilities Commission v. Water Company*, 248 N.C. 27, 102 S.E.2d 377 (1958), in which the Supreme Court held that the New Hope Water Company ("New Hope") was not a public utility even though it owned water pipes connecting areas outside the city limits to Gastonia's water distribution system. New Hope owned the lines and charged a tap-in fee but did not provide or charge for water service through the lines. The Court held that New Hope was not a public utility because it did not sell water for compensation.

Although New Hope owned the distribution lines, it did not own the backbone facilities that provided the actual service through the lines. Furthermore, New Hope could refuse service through their lines. "A public utility must serve alike all who are similarly circumstanced with reference to its system, and favor cannot be extended to one which is not offered to another, nor can a privilege given one be refused another." *Id.* at 30, 102 S.E.2d at 379. Thus, New Hope was not providing service to the public, only to those it allowed to tap into the system.

CWS, like New Hope, owns the distribution lines. However, unlike New Hope, CWS cannot refuse access to the water and sewer systems as every purchaser of property in the Buck Island development is entitled to access to the utilities system. In addition, Buck Island and Monteray Shores own and control the backbone water and

sewer facilities and have continuing responsibility in regards to maintenance and expansion of the facilities. Since Buck Island and Monteray Shores control the manner in which the facilities are used, and since the purchasers of the lots in Buck Island have access to the utilities as a matter of right, Buck Island provides service to the public.

In the 4 October 2001 hearing, Mr. DeGabrielle stated that the owners of the backbone facilities would take whatever action was needed to meet the obligations of the contract with CWS and to conform to the requirements of the State in order to meet the spikes in demand. Therefore, as found by the Commission, Buck Island and Monteray Shores exercise "control over the availability of capacity in the system, which, in turn, affects the manner in which the system is operated." This finding further distinguishes Buck Island from *New Hope*, since New Hope, unlike Buck Island, had no involvement in providing future capacity to the public through the backbone facilities.

The Commission's conclusion in the 2002 order that Buck Island is a public utility was supported by substantial, competent, and material evidence. Therefore, we hold that Buck Island is a public utility as defined in N.C. Gen. Stat. § 62-3(23) and thus, is subject to regulation by the North Carolina Utilities Commission.

IV.

[3] Buck Island next argues that the Commission erred in modifying the USOA to require it to expand the backbone facilities upon demand by CWS. The 1 April 2002 order did state that CWS "should use its existing contractual rights . . . to ensure that any needed expansion of facilities necessary to provide adequate and reliable water and sewer utility service in Buck Island, Corolla Shores and Monteray Shores is accomplished in the most efficient and equitable manner possible . . . ." However, since the Commission found that the USOA required sufficient capacity for Buck Island and Monteray Shores, they believed no significant modification of the agreement was necessary. The order further stated that "Buck Island and Monteray Shores are obligated to expand the existing 'backbone' facilities upon reasonable demand . . . *to end users located in Buck Island and Monteray Shores*." (Emphasis added). Since the obligation did not extend to Corolla Shores, this statement was consistent with the USOA.

STATE ex rel. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

Moreover, as determined by this Court, the 1 April order was an interlocutory order. *Buck Island, Inc.*, 158 N.C. App. at 538-39, 581 S.E.2d at 122. In the final order on 19 August 2002, the Commission found that CWS had

> no obligation to serve until Ocean Club builds or obtains the capacity it needs. The Commission leaves to Ocean Club the choice of whether to construct its own water and wastewater facilities and, if so, where, or whether to negotiate with Intervenors to expand and utilize the existing facilities within Monteray Shores.

Therefore, appellant has misconstrued the orders. Rather than granting CWS authority to demand expansion of the backbone facilities to serve Corolla Shores, the Commission ordered OCV to obtain the capacity needed for Corolla Shores before CWS was required to serve it. Pursuant to the USOA, Buck Island was required to provide adequate capacity for end users in Monteray Shores and Buck Island only.

In any event, public utilities have an obligation to provide "adequate, efficient and reasonable service." N.C. Gen. Stat. § 62-131(b) (2003). In order to meet this obligation, our legislature gave the Utilities Commission the power and authority to supervise and control the rates charged and the services rendered by a public utility. N.C. Gen. Stat. §§ 62-30, 62-31, 62-32, 62-131 (2003). Although appellant misunderstood the orders, the Commission, nevertheless, has the power and authority to modify or abrogate contracts of a public utility if they do not serve the public welfare. N.C. Gen. Stat. §§ 62-30 and 62-32 (2003); *In re Application by C&P Enterprises, Inc.*, 126 N.C. App. 495, 499, 486 S.E.2d 223, 226, *disc. review denied*, 347 N.C. 136, 492 S.E.2d 36 (1997). Therefore, regardless of the fact that appellant misinterpreted the agreement, their argument is without merit.

V.

**[4]** Buck Island also contends the Commission's 20 March 2001 and 1 April 2002 orders requiring it to expand the backbone facilities constitute an unlawful taking of property prohibited by the North Carolina Constitution and an impairment of their contractual rights in violation of the United States Constitution. Article 1 Section 19 of the North Carolina Constitution provides: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or

STATE ex rel. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

property, but by the law of the land." N.C. Const. art. I, § 19. Though the clause does not expressly prohibit the taking of private property for public use without just compensation, our Supreme Court has "inferred such a provision as a fundamental right integral to the 'law of the land.' " *Piedmont Triad Reg'l Water Auth. v. Unger*, 154 N.C. App. 589, 592, 572 S.E.2d 832, 834 (2002), *disc. review denied*, 357 N.C. 165, 580 S.E.2d 695 (2003) (citation omitted).

"Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977). A 'taking' is defined as

> entering upon private property for more than a momentary period, and under warrant or color of legal authority, devoting it to a public use, or otherwise informally appropriating or injuriously affecting it in such a way as substantially to oust the owner and deprive him of all beneficial enjoyment thereof.

*Eastern Appraisal Services v. State of North Carolina*, 118 N.C. App. 692, 695, 457 S.E.2d 312, 313, *appeal dismissed, disc. review denied*, 341 N.C. 648, 462 S.E.2d 509 (1995) (citation omitted). When property is taken for a public use, just compensation must be paid. *In re Trusteeship of Kenan*, 261 N.C.1, 134 S.E.2d 85 (1964).

As previously discussed, even though the Commission had the authority to modify or abrogate the USOA, N.C. Gen. Stat. §§ 62-30 and 62-32 (2003); *C&P Enterprises*, 126 N.C. App. at 499, 486 S.E.2d 223 at 226, the final order on 19 August 2002 did not require Buck Island to expand the facilities upon demand by CWS. Despite the Commission's finding that it was "reasonable for the facilities serving the three developments to be interconnected and operated" by CWS, Buck Island was not required to use the property in any manner inconsistent with its previous obligations under the USOA. Moreover, the Commission did not force a change in Buck Island's contractual commitments with Monteray Shores or CWS.

The Commission's orders did nothing to deprive Buck Island of the beneficial enjoyment of the land on which the backbone facilities are located and thus, cannot be considered a taking. If at some point in the future, Buck Island is deprived of the use of its land, it must be adequately compensated. Until the State deprives Buck Island of the use of its property, and has denied compensation, a taking without just compensation has not occurred.

Buck Island also argues that N.C. Gen. Stat. § 62-32 (2003), which gives the Commission the power to require Buck Island to use the backbone facilities consistent with Commission rules, unlawfully impairs its contract in violation of Article I, Section 10 of the United States Constitution which provides in pertinent part, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10, cl. 1. Although this "provision limits the power of the states to amend or abolish the obligations of a contract," *Citicorp v. Currie, Comr. of Banks,* 75 N.C. App. 312, 315, 330 S.E.2d 635, 637, *appeal dismissed, disc. review denied,* 314 N.C. 538, 335 S.E.2d 15 (1985), it does not "strip the states of their police power to protect the general welfare of the people." *Id.*

"In determining whether a contractual right has been unconstitutionally impaired, we are guided by the three-part test set forth in *U.S. Trust Co. of N.Y. v. New Jersey,*" *Bailey v. State of North Carolina,* 348 N.C. 130, 140-41, 500 S.E.2d 54, 60 (1998), and adopted by the North Carolina Supreme Court in *Simpson v. N.C. Local Gov't Employees' Retirement System,* 88 N.C. App. 218, 363 S.E.2d 90 (1987), *aff'd,* 323 N.C. 362, 372 S.E.2d 559 (1988). This test requires the court "to ascertain: (1) whether a contractual obligation is present, (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose." *Bailey* at 141, 500 S.E.2d at 60.

We have previously concluded that Buck Island is a *de facto* public utility; it is subject to regulation under Chapter 62 of the North Carolina General Statutes. Moreover, the statutes give the Commission authority to regulate the services and operations of public utilities, N.C. Gen. Stat. § 62-2(b) (2003), including the right to modify or abrogate private agreements between parties with respect to the operation of a public utility, "upon a showing that the contracts do not serve the public welfare." *State of N.C. ex rel. Utils. Comm'n v. Carolina Water Serv., Inc.,* 149 N.C. App. 656, 657, 562 S.E.2d 60, 62 (2002). Therefore, a contractual obligation was present and Buck Island's rights were impaired to the extent that their contract was subject to modification by the Commission.

In the 20 March 2001 order, the Commission concluded that the existing contractual arrangements under which water and sewer service are provided to Buck Island and Monteray Shores were not consistent with the public interest because Monteray Shores could exercise unilateral control of the utility service in CWS's franchised

service territory. This subject was not thereafter at issue and thus, was not addressed in the 1 April 2002 order. Impairment of the contract was reasonable and necessary to serve the public interest and therefore, does not violate the contracts clause.

## Cross Appeal of Ocean Club Ventures

### I.

[5] Complainant-cross-appellant, OCV, cross appeals claiming that the Commission's final ruling that OCV must provide its own water and sewer facilities is contrary to the Commission's prior determination. Complainant also argues that the change in the Commission's analysis was made without explanation.

Although the 20 March 2001 order concluded that CWS should extend service to Corolla Shores, the Commission did not determine who should provide the additional capacity, deciding only that CWS should provide the service under "reasonable terms and conditions" as outlined by the Commission. According to the order, the extent to which OCV should be allowed to utilize the existing backbone facilities depended on whether the existing facilities were adequate to serve Corolla Shores and still provide sufficient capacity to serve Buck Island and Monteray Shores at full buildout.

Although evidence showed that the existing facilities were intended to serve all three phases of Monteray Shores and Buck Island, other evidence established that actual residential consumption of water in Buck Island and Monteray Shores was at least forty percent greater than anticipated when the facilities were built. This increased consumption indicated that almost all of the capacity would be needed to serve Buck Island and Monteray Shores at full buildout. Because OCV did not meet its burden of proving that the existing facilities were adequate to serve all three areas at completion, the Commission concluded CWS's obligation to provide service to Corolla Shores depended on OCV's willingness to pay for the facilities needed to increase capacity.

Finally, the Commission ordered the parties to develop a plan for obtaining the additional capacity as well as an estimate for the amount OCV should be required to contribute. The Commission would then "conduct further proceedings and issue any additional orders." Clearly, the Commission considered the 20 March 2001 order interlocutory.

STATE EX REL. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

In the 17 August 2001 order, the Commission ordered CWS to interconnect with the existing facilities and provide interim service to Corolla Shores. However, the Commission, in an effort to protect end users in Buck Island and Monteray Shores, qualified its order to provide that CWS could, after proper notice, sever or block the interconnection should demand in the three developments outstrip capacity. As with the previous order, the Commission considered this order interlocutory as it specifically stated that additional proceedings and orders may be necessary to implement a final solution.

OCV contends that in the 1 April 2002 order the Commission required CWS to "take all steps reasonably necessary to ensure the provision of safe, reliable and adequate water and utility service to customers in Buck Island, *Corolla Shores*, and Monteray Shores." (Emphasis added). However, OCV fails to point out that the Commission required that this be done "in a manner consistent with the Commission's rules and the Commission's decisions in this proceeding." The Commission also states that "[t]he issue of how best to provide service to Corolla Shores is reserved for the next stage in these proceedings." These conclusions do not indicate that the Commission made any final determination of how service should be provided to Corolla Shores.

Despite OCV's assertion that the only issue left to resolve in the 19 August 2002 order was how to extend service to Corolla Shores, our review of the record reveals clearly that the previous orders were interlocutory. OCV concedes the Commission found that CWS should provide the service under "reasonable terms and conditions," but fails to recognize that the previous orders were not inconsistent as the conditions were not permanently established until the final 19 August 2002 order.

OCV relies on *Colorado Interstate Gas Co. v. F.E.R.C.*, 850 F.2d 769 (D.C. Cir. 1988), where the court found that the Federal Energy Regulatory Commission's dissimilar treatment of two similar cases was arbitrary and capricious. However, this decision can be distinguished because those two cases were each final determinations rather than, as here, one case with interlocutory rulings prior to a final order.

The Commission's conclusion that OCV must provide its own water and sewer facilities is not inconsistent with the Commission's prior interlocutory orders and is not arbitrary or capricious. Accordingly, this assignment of error is overruled.

STATE ex rel. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

## II.

[6] Next, OCV contends the Commission's ruling that OCV must provide its own water and sewer capacity is inconsistent with prevailing principles of public utility law. In order to protect the public from poor service and exorbitant charges which are normal consequences of a monopoly, *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 335-36, 189 S.E.2d 705, 717 (1972), our legislature has given the Utilities Commission the authority to supervise and control public utilities. N.C. Gen. Stat. §§ 62-30, 62-31, 62-32, 62-131 (2003). The Commission may not, however, authorize a practice which is forbidden by statute. *Utilities Comm. v. Merchandising Corp.*, 288 N.C. 715, 722, 220 S.E.2d 304, 309 (1975).

Commission rules provide that a utility company may refuse service to an applicant, if, in the judgment of the utility, it does not have adequate capacity to provide the service requested. N.C. Admin. Code tit. 4, r. 11.R7-17 and 11.R10-13. In addition, a water or sewer utility can require an applicant requesting the extension of water or sewer service to a subdivision to pay in advance for additional pressure or storage facilities. N.C. Admin. Code tit. 4, r. 11.R7-17(c) and 11.R10-13(c).

The Utilities Commission, in its 1 April 2002 order, required CWS to determine the amount of capacity needed to provide service in all three developments and to develop a plan for "obtaining the needed capacity in the most economic, efficient and equitable manner possible." CWS, in its 15 May 2002 response to the Commission's order, concluded that existing capacity was insufficient to meet the demand in Buck Island, Monteray Shores and Corolla Shores. Therefore, CWS offered three proposals detailing the advantages and disadvantages of each and acknowledging that because of the complicated issues, it was impossible to find a solution that met the interests of all parties.

After considering the proposed solutions, the Utilities Commission reiterated in its 19 August 2002 order that it was reasonable for the utilities in the three developments to interconnect and operate as a single system. However, the Commission chose the third option, leaving to OCV "the choice of whether to construct its own water and wastewater facilities, . . . or whether to negotiate with Intervenors [Buck Island and Monteray Shores] to expand and utilize the existing facilities within Monteray Shores." Because the backbone facility capacity was inadequate to serve Corolla Shores in addition to

STATE ex rel. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

Buck Island and Monteray Shores, CWS was authorized to decline service to OCV until sufficient capacity was provided. N.C. Admin. Code tit. 4, r. 11.R7-17 and 11.R10-13. In addition, CWS was authorized to require OCV to prepay for the additional facilities needed. N.C. Admin. Code tit. 4, r. 11.R7-17(c) and 11.R10-13. The Commission's order did not leave OCV without options; it only required that OCV pay the owners of the backbone facilities to provide additional capacity or build its own facilities. Once adequate capacity is present, CWS is still required to provide reasonable utility service. For these reasons, the Commission's order is not inconsistent with prevailing principles of public utility law and is supported by competent evidence.

III.

**[7]** Finally, OCV asserts that the 19 August 2002 order constitutes an effective abandonment of the Commission's jurisdiction over the provision of water and sewer utility service within Corolla Shores. The Commission's authority to order OCV to construct facilities or to negotiate with Monteray Shores and Buck Island to expand the existing facilities is established in N.C. Gen. Stat. § 62-42(a) (2003) which states, *inter alia:*

[W]henever the Commission, after notice and hearing had upon its own motion or upon complaint, finds:

. . .

(2) That persons are not served who may reasonably be served, or

(3) That additions, extensions, repairs or improvements to, or changes in, the existing plant, equipment, apparatus, facilities or other physical property of any public utility, of any two or more public utilities ought reasonably to be made, or

. . .

the Commission shall enter and serve an order directing that such additions, extensions, repairs, improvements, or additional services or changes shall be made or affected within a reasonable time prescribed in the order.

The Commission, in choosing the service extension option, effectively exercised its jurisdiction as provided by the above statute.

STATE EX REL. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

OCV contends that it is in the same position as it would be if there were no certificated utility obligated to provide service to Corolla Shores. However, CWS is obligated to provide service to Corolla Shores once the necessary capacity has been added by OCV. Once OCV provides sufficient capacity, the systems will interconnect and operate as a single system, thus providing a solution to the need for water and sewer service within Corolla Shores.

By not taking steps to control Monteray Shores and Buck Island and by not amending the portion of the agreements that are inconsistent with the public interest, OCV maintains that the final order leaves issues unresolved. Since Buck Island and Monteray Shores were declared to be public utilities, the Commission may exercise jurisdiction at any time. On the other hand, the Commission appears to anticipate that once additional facilities are in place and CWS has exercised complete control over the operation of all facilities, Buck Island and Monteray Shores may no longer qualify as public utilities. However, the Commission may still exercise jurisdiction since after notice to the parties and a hearing, the Commission may at any time "rescind, alter or amend any order or decision." N.C. Gen. Stat. § 62-80 (2003). Thus, the Commission can take action if Buck Island or Monteray Shores fail to comply with any of the Commission's orders. The Commission has not abandoned its jurisdiction over water and sewer utilities; this assignment of error is overruled.

IV.

Complainant's remaining assignments of error were not brought forward in the brief and are therefore deemed abandoned. N.C. R. App. P. 28(a).

The Final Order of the Utilities Commission is affirmed.

Affirmed.

Judges BRYANT and GEER concur.