DILLON, Judge, dissenting.
I conclude that NC WARN is not acting as a "public utility" because the solar panel system at issue is not serving "the public," but rather is designed to generate power for a single customer (the "Church") from the Church's property. Therefore, I respectfully dissent.
The Public Utilities Act gives the Commission the power to supervise and control the "public utilities" in our State. N.C. Gen. Stat. § 62-30 (2015). A "public utility" as defined by our General Assembly is any entity which "own[s] or operate[s]" "equipment or facilities" that provide "electricity" "to or for the public for compensation." N.C. Gen. Stat. § 62-3(23)(a) (2015) (emphasis added).
I agree with the majority that NC WARN "owns and operates" "equipment" (a system of solar panels) which provides "electricity" "for compensation." However, I disagree with the majority that the equipment at issue here is designed to produce electricity "for the public," because the system of solar panels in this case is designed to produce electricity on the property of a single customer for that customer's sole use.
*621 Our Supreme Court has had occasion to define the contours of what constitutes a "public utility," subject to regulation by our Utilities Commission. But every instance cited by the majority where our Supreme Court has determined that a "public utility" exists involved equipment or a facility which served multiple customers . The majority's decision today appears to be the first in North Carolina where equipment designed to generate power (or other utility-type service) for a single customer from the customer's own property is held to be a "public utility" subject to regulation by our Utilities Commission.
In 1958, for instance, our Supreme Court stated that "the true criterion by which to determine whether a plant or system is a public utility is whether or not the public may enjoy it of right or by permission only[.]" Utilities Comm'n v. New Hope , 248 N.C. 27, 30, 102 S.E.2d 377, 379 (1958). The Court further stated that "an attempt to declare a company or enterprise to be a public utility, where it is inherently not such, is, by virtue of the guaranties of the federal Constitution, void wherever it interferes with private rights of property or contract." Id. NC WARN's solar panel equipment at issue here is not designed to be enjoyed by the public either by right or by permission; rather, the system was designed only to be enjoyed by the Church , pursuant to a private contractual agreement.
*718 Ten years later, in 1968, our Supreme Court considered the definition of "the public" in the context of utilities regulation in Utilities Comm'n v. Carolina Telegraph Co. , 267 N.C. 257, 148 S.E.2d 100 (1966), a case in which a company sought to establish a mobile radio telephone service for a small area with an estimated thirty-three (33) customers. Our Supreme Court held that the operation was a public utility, stating:
One offers service [to] the "public" within the meaning of th[e] statute when he holds himself out as willing to serve all who apply up to the capacity of [his] facilities.... For example, the operator of a single vehicle within a single community may be a common carrier.
Id. at 268, 148 S.E.2d at 109. However, NC WARN's solar panel "facility" is markedly different than the "public utility" described by the Supreme Court in this 1968 opinion. Where the "single vehicle" in the Supreme Court's example is designed to serve multiple members of the public, the solar panel equipment at issue here is designed to serve only one customer, and has not been made available to any other customer.
A decade later, in 1978, in the case relied upon by the majority today, our Supreme Court clarified Carolina Telegraph by holding that a *622 system may be serving "the public" even where it serves only a "selected class of persons" and is not designed to serve "everybody all the time." Utilities Comm'n v. Simpson , 295 N.C. 519, 522, 246 S.E.2d 753, 755 (1978). In Simpson , the Court articulated a list of factors, cited by the majority, which inform whether a particular enterprise is considered a "public utility." I believe the majority applied these factors much more broadly than Simpson intends.
In Simpson , our Supreme Court provides a guide as to the application of these factors by referencing a number of cases from other jurisdictions, concluding that those cases all "seem correctly decided." Id. at 524, 246 S.E.2d at 756. Several of those cases cited concluded that certain operations-each of which were designed to serve multiple customers-constituted "public utilities," where each operation was designed to serve a select class of customers rather than the public at large. However, our Supreme Court also cited a Pennsylvania case which concluded that the furnishing of electric service to tenants of a single apartment building by the building owner (where the owner bought electricity from the public utility company and then resold it to its tenants) did not constitute the operation of a public utility: "Here ... those to be serviced consist only of a special class of persons-those to be selected as tenants-and not a class opened to the indefinite public . Such persons clearly constitute a defined, privileged[,] and limited group and the proposed service to them would be private in nature." Id. at 524-25, 246 S.E.2d at 756 (quoting Drexelbrook v. Pennsylvania Public Utility Comm'n , 418 Pa. 430, 436, 212 A.2d 237, 240 (1965). NC WARN's system is designed to serve a group even more limited (a single customer) than the group served by the system in the Pennsylvania case (tenants in a single building).
In the years since Simpson was decided, our appellate courts have applied Simpson to determine whether a certain enterprise constituted a "public utility." Many of these cases are cited by the Commission in support of its order. However, unlike the present case, each of those cases involved a system which provided some utility service to multiple consumers accessing the system. See Simpson , 295 N.C. at 520, 246 S.E.2d at 754 (two-way radio service operated in conjunction with telephone answering service, using tower that serves multiple subscribers); Bellsouth Carolinas PCS, L.P. v. Henderson Cty. Zoning Bd. Of Adjustment , 174 N.C. App. 574, 621 S.E.2d 270 (2005) (cellular telephone company operating cellular telephone tower serving multiple customers); Utilities Comm'n v. Mackie , 79 N.C. App. 19, 338 S.E.2d 888 (1986), aff'd as modified , 318 N.C. 686, 351 S.E.2d 289 (1987) (sewer and water *623 service with approximately twenty-five (25) customers served from a single tank); Utilities Comm'n v. Buck Island, Inc. , 162 N.C. App. 568, 592 S.E.2d 244 (2004) (facilities used to produce water and treat sewage in housing development); Shepard v. Bonita Vista Properties, L.P., 191 N.C. App. 614, 664 S.E.2d 388 (2008), aff'd , 363 N.C. 252, 675 S.E.2d 332 (2009) (campground charging the *719 occupants of each campsite for use of electricity from a single system at above-market price).
In conclusion, I believe that our Supreme Court's jurisprudence compels the conclusion in the present case that NC WARN's equipment, which is designed to generate power for a single customer, is not a "public utility." This conclusion is also consistent with the General Assembly's declared policy in the Public Utilities Act "[t]o promote the development of renewable energy" and "encourage private investment in renewable energy and energy efficiency." See N.C. Gen. Stat. § 62-2(a)(10) ; see also N.C. Gen. Stat. 105-277 (exempting solar panel systems used to heat a property from taxation); see also Simpson , 295 N.C. at 524, 246 S.E.2d at 757 (stating that the definition of "public" must "accomplish the legislature's purpose and comport[ ] with its public policy") (internal marks and citation omitted).
Further, this conclusion is consistent with the prior opinions of the Commission in In re Application of FLS YK Farm, LLC , N.C.U.C. Docket No. RET-4, Sub 0, 2009 WL 1106526 (April 22, 2009) and In re Request by Progress Solar Investments, LLC , N.C.U.C. Docket No. SP-100, Sub 24, 2009 WL 4197406 (Nov. 25, 2009). In those cases, the Commission concluded that the entities at issue were not public utilities where the entities "owne[d] or operat[ed] solar thermal panels located on-site to a single entity pursuant to a 'bargained for' transaction[.]" Progress Solar , N.C.U.C. Docket No. SP 100, Sub 24 ; FLS YK Farm , N.C.U.C. Docket No. RET-4, Sub 0. And in FLS YK Farm , the Commission noted that "FLS YK Farm will not be holding itself out to provide solar thermal heat production to the general public, but rather plans to sell the BTUs ("British Thermal Units") created by its on-site thermal panels only to the [Inn] and solely for the purpose of heating water owned by [the Inn]."
In the present case, however, the Commission has reached an opposite conclusion in spite of the fact that, like the providers in FLS YK Farm and Progress Solar , NC WARN owns and maintains the equipment on the property of a single customer which is designed to generate power from the customer's property for the sole use of that customer (and for no other NC WARN customer). The Commission seems to distinguish NC WARN's arrangement with the Church from its prior decisions merely based on the manner NC WARN is being compensated *624 by the Church. Indeed, at oral argument, counsel for the Commission stated that if NC WARN's arrangement with the Church were structured as a lease agreement, rather than as a contract where NC WARN was compensated based on the Church's usage, the Commission would not be challenging the arrangement in court.
However, to me, the manner in which NC WARN and the Church choose for NC WARN to be compensated-based on usage rather than based on a flat rate per month-does not convert NC WARN's solar panel system on the Church's property into a public utility. Indeed, a hardware store renting a portable generator to a homeowner would not be acting as a public utility if it chose to charge the customer, at least in part, based on the power generated by the generator rather than solely at a flat daily rate. Such billing is a logical method by which private parties should be free to contract to account for wear and tear on the system itself. Certainly it is true that the more the system operates, the quicker its components deteriorate and need maintenance, repair, or replacement. And N.C. Gen. Stat. § 62-3(23) does not deem the form of compensation relevant to the determination of whether a system is serving "the public." Certainly, the Commission would not argue that Duke Energy would cease operating as a public utility subject to regulation if it changed its billing method to a flat monthly rate for unlimited access to its power grid.
Additionally, I would point out that the fact that NC WARN might, in the future, enter into similar private contracts with other entities seeking to install other solar panel systems does not compel the conclusion that NC WARN is holding itself out as willing to serve "all who apply up to the capacity of [the] facilit[y]" at issue here . Indeed, a hardware store does not act as a public utility simply because it leases out more than one *720 generator. The Simpson factors focus on the function of the single system or facility at issue , not the company offering the service, the company's marketing of its service, or the manner of compensation given to the company in exchange for the service. Here, NC WARN is not holding itself out as willing to serve others up to the capacity of the Church's solar system. NC WARN's system will produce electricity solely for the Church and the power generated by the system is not accessible by NC WARN or any other party or entity.[5] I disagree with the *625 majority's characterization of the Church itself-a single customer-as "the public." See Simpson , 295 N.C. at 524, 246 S.E.2d at 757.
In conclusion, this case does not involve a solar panel farm providing power to multiple customers off-site. It involves solar panel equipment located on the property of a single customer designed to produce power for that customer where no adjacent property owners or other members of the public have the right to tap into the system. Based on the General Assembly's current definition of "public utility," I conclude that NC WARN's system is not a public utility and is thus not subject to regulation by our Utilities Commission. The General Assembly is certainly free to broaden the definition of "public utility" (within constitutional limits). However, based on the General Assembly's current definition and our Supreme Court's jurisprudence, I vote to reverse the Commission's decision regarding this private contract between NC WARN and the Church. See New Hope , 248 N.C. at 30, 102 S.E.2d at 380 ("[A]n attempt to declare [NC WARN] to be a public utility where it is inherently not such, is ... void wherever it interferes with private rights of ... contract.").

The majority notes, in a footnote, that the fact that the excess energy created by the Church's system will be transferred to Duke Energy's power grid "leads us to conclude that NC WARN is in fact 'hold[ing itself] out as willing to serve all who apply up to the capacity of [its] facilities." I am wholly unpersuaded by this characterization, and do not believe there is sufficient information in the record from which we could undertake an informed interpretation of Duke Energy's voluntary net metering credit program.